# United States Court of Appeals
## For the First Circuit

No. 11-2289

BARCLAYS BANK PLC,

Plaintiff, Appellee,

v.

THOMAS A. POYNTER, individually and as
Trustee of the Leningrad Cowboys Trust,

Defendant, Appellant,

SIMPLY INTERACTIVE, INC.; THE TRANSITIONS GROUP, INC.;
TRANSITIONS CAPITAL, INC.; TRANSITIONS INTERNATIONAL, INC.;
TRANSITIONS CAPITAL INVESTORS, LLC; TRANSITIONS CAPITAL
MANAGEMENT LLC; WAINWRIGHT BANK AND TRUST COMPANY; BANK OF
AMERICA, N. A.; FIDELITY BROKERAGE SERVICES, LLC; CITIBANK, NA;
BOSTON PRIVATE BANK AND TRUST COMPANY,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin,[*] Hawkins,[**] and Thompson, Circuit Judges.

Edmund Polubinski, Jr., with whom Lyne, Woodworth & Evarts
LLP was on brief, for appellant.

---

[*] Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion. The remaining two panelists issue this opinion pursuant to 28 U.S.C. § 46(d).

[**] Of the Ninth Circuit, sitting by designation.

Michael D. Vhay, with whom Lauren Ann H. Pond and DLA PIPER LLP were on brief, for appellee.

March 13, 2013

**THOMPSON**, **Circuit Judge**. With the help of a loan from Barclays Bank, PLC ("Barclays"), Dr. Thomas Poynter bought a custom-made yacht. When he stopped making payments on the loan, Barclays repossessed the yacht and sold it. Barclays got less than what Poynter owed and so it sued him for the deficiency. Poynter moved for summary judgment arguing that Barclays was not entitled to collect because it had not provided him with proper notice of the sale. The district court was not convinced; it denied Poynter's motion and sua sponte granted summary judgment in favor of Barclays. Poynter now appeals. Discerning no merit to his argument, we affirm.

## BACKGROUND

We state the facts in the light most favorable to Poynter, the party contesting summary judgment, drawing all reasonable inferences in his favor. Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993).

In November 2005, Barclays loaned Poynter 1.4 million Euros toward the purchase of a 2005 Oyster 62 Yacht called the Blue Beach. Poynter granted Barclays a first preferred ship mortgage on the vessel (the "mortgage"), which provided that Poynter would pay only interest for the first twenty-four months of the loan and installments of principal plus interest after that. Poynter signed the mortgage in Massachusetts, his place of residence and the location of the yacht.

A few years later, in 2008, Poynter sought to renegotiate the loan terms to allow him to continue paying only interest. Barclays agreed that Poynter could make interest-only payments for September through November of that year but said that was it. But when his first principal/interest payment came due in December, Poynter failed to pay. He was issued a formal notice of default sometime around March of 2009.

Rather than repossess the yacht, Barclays decided to work with Poynter to sell it and, hoping to fetch a good price, they moved the Blue Beach from Boston, Massachusetts to Newport, Rhode Island. But, after several months without a successful sale, Barclays repossessed the yacht. Barclays moved it to Florida and listed it for sale with National Liquidators, a boat liquidation company.

On February 5, 2010, Barclays sent Poynter a "Notice of Our Plan to Sell Property." Citing provisions of Florida's Uniform Commercial Code ("UCC")[1] that relate to a secured party's rights after a debtor's default, the notice stated: "Further to the repossession of your 2005 Oyster 62, Hull ID #OYM0160KL505 in November this year, we herby [sic] provide notice of our intention to sell the vessel pursuant to Florida Statues [sic]: F.S. 679.609; 679.610; 679.612, and 679.613. The vessel . . . will be sold by way of private sale sometime after the date of this letter." The

---

[1] See Fla. Stat. Ann. § 671.101 et seq.

-4-

notice did not include a date, time, or place of sale. The notice, which indicated what Poynter still owed in principal and interest, went on to state that any remaining balance was Poynter's responsibility. It also said that Poynter had the right to settle up his debts and if he did, the Blue Beach would be released.

Poynter responded the same day by email to Barclays's Marine Risk and Recoveries Co-ordinator, stating: "thank you for your note." Just about two months later, on March 31, 2010, Barclays sold the yacht for 986,019 Euros. On April 22, Barclays informed Poynter of the sale and that the residual balance Poynter owed was 683,297 Euros. Poynter ignored Barclays's balance request.

And so, a short time later, Barclays sued Poynter in Massachusetts federal district court.[2] Barclays filed suit pursuant to the Commercial Instruments and Maritime Liens Act (the "Ship Mortgage Act"), 46 U.S.C. § 31301 et seq., which provides a means for enforcing preferred mortgages in admiralty. Citing Poynter's default, Barclays sought to recover the deficiency. Poynter, after answering the complaint, moved for summary judgment. He claimed that Barclays was barred from recovering the deficiency because, in violation of the mortgage's terms, it did not provide Poynter with proper notice of the sale. Barclays, focusing on a

---

[2] Barclays also sued several reach and apply defendants, a practice allowed under Massachusetts law, Mass. Gen. Laws ch. 214, § 3(6), who are not parties to this appeal.

different mortgage provision than Poynter (more on who was relying on what to come), asserted that it did provide proper notice. The district court sided with Barclays. The court denied Poynter's motion and sua sponte granted Barclays summary judgment on the issue of liability. Poynter now appeals the grant of summary judgment.

## STANDARD OF REVIEW

We review orders for summary judgment de novo, assessing the record "in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Landrau-Romero v. Banco Popular De P.R., 212 F.3d 607, 611 (1st Cir. 2000); Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). A district court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ANALYSIS

As we alluded to, Poynter and Barclays have different ideas about what kind of notice of sale Barclays was required to give under the mortgage. To remind the reader of the more salient facts: Barclays sold the yacht pursuant to the Florida UCC; the February 5th notice of intent to sell was the only advance notice Poynter received of the sale; this notice did not specify where and

when the sale would be; the yacht was sold about two months after the notice issued.  We proceed to the arguments.

To support his stance, Poynter relies on Section 4.05 of the mortgage, which provides in pertinent part that in the event of default Barclays may repossess the yacht and then sell it "at any place and at such time as Mortgagee may specify and in such manner as Mortgagee may deem advisable . . . after first giving Owner notice thereof ten (10) days in advance of the time and place of sale."[3]  Poynter reads this language to mean that ten days notice as to the time and date of a sale is required in all sales deemed advisable by Barclays including sales conducted under a UCC.[4]  Thus Poynter claims that the February 5th notice of intent to sell, which lacked a time and place, was insufficient.  The second half

_____

[3] In its entirety, Section 4.05 indicates that Barclays may in the event of default: "Take and enter into possession of the Vessel subject to this Mortgage, at any time, wherever the same may be, without legal process, and if it seems desirable to Mortgagee and without being responsible for loss or damage, sell the Vessel, at any place and at such time as Mortgagee may specify and in such manner as Mortgagee may deem advisable, free from any claim by Owner in admiralty, at law or by statute, after first giving Owner notice thereof ten (10) days in advance of the time and place of sale."

[4] Poynter does not dispute (though he took a different position below) that Barclays was allowed to sell the yacht using the self-help repossession and sale remedies of Florida's UCC.  Nor would such an argument be sound.  Following a circuit split, the Ship Mortgage Act was amended in 1996 to provide that federal courts were not the exclusive means for enforcing a preferred ship mortgage and instead, the mortgagee could use state law self-help remedies (such as UCC remedies) to enforce the mortgage.  See 46 U.S.C. § 31325(b)(3).

of Poynter's argument is that because the notice was substandard, Barclays should not be allowed to collect the deficiency. For support Poynter relies on what he calls "the analogous area of real estate mortgages," claiming that Massachusetts law prohibits a real estate mortgagee that does not comply with statutory notice requirements from collecting a deficiency. Poynter thinks this rule should apply to Barclays.

Barclays counters that it was not in fact required to comply with Section 4.05's notice proviso.[5] Barclays claims that it sold the yacht under Section 4.06 of the mortgage, which provides that Barclays may exercise any "rights, privileges and remedies granted by applicable law" - the applicable law here being the Florida UCC.[6] Barclays argues that Sections 4.05's notice

---

[5] Poynter professes that Barclays should be estopped from taking this position. He argues that paragraph 28 of the complaint, which stated that Barclays repossessed the yacht "having given Poynter ten (10) days notice as required under the Preferred Mortgage," constituted an admission on Barclays's part that the requirements of Section 4.05 applied. We can make quick work of this argument and so dispose of it now. Barclays did not reference Section 4.05 anywhere in the complaint. Further nothing in the complaint contradicts Barclays's assertion to this court that paragraph 28 referred to notice as required under the Florida UCC, which states that notification of disposition sent ten days or more before the earliest time of disposition is reasonable. See Fla. Stat. Ann. § 679.612(2).

[6] As a whole, 4.06 indicates that in the case of default Barclays may: "Exercise all rights, privileges and remedies in foreclosure or otherwise given the Mortgagee by this Mortgage, or by any other instrument evidencing the indebtedness or the Obligations or securing performance thereof, as well as such other rights, privileges and remedies granted by applicable law."

-8-

requirements, according to the mortgage's plain language, do not apply to every sale as Poynter says, including 4.06 sales. Barclays also throws about a few alternative arguments should we disagree about 4.05's applicability, such as: Poynter's actual notice of the sale waives any procedural defaults and there is no basis for extending Massachusetts statutory real estate law to this case.

In the end, we are tasked with answering one central question: does Section 4.05 impose an umbrella notice requirement on all post-default sale procedures as Poynter argues, or does Section 4.06 provide a stand-alone remedy free of Section 4.05's procedural dictates as Barclays contends? We think, based on the clear language of the mortgage, that Barclays has it right. We explain, starting with some general contract interpretation principles.

To start with, we forgo embarking on a choice of law analysis. Instead we simply elect to interpret the mortgage under Massachusetts law because both parties agree that it applies and because there is at least a reasonable relationship between this dispute and Massachusetts. See Merchants Inc. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 8 (1st Cir. 1998) (taking the same approach in a diversity case).

When interpreting a contract, courts must assess whether the contract at issue (here the mortgage) is ambiguous, Bank v.

Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008), a question of law in Massachusetts, Lass v. Bank of Am., N.A., 695 F.3d 129, 134 (1st Cir. 2012). To answer the ambiguity question, we examine "the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or intention of the parties." Bank, 888 N.E.2d at 907. Language is only ambiguous "if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Lass, 695 F.3d at 134 (internal quotation marks omitted). Ambiguity, however, is not created just because the parties disagree about the contract's meaning. Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011).

Contracts found free from ambiguity are interpreted according to their plain terms; we construe all words according to "their usual and ordinary sense." Gen. Convention on New Jerusalem in the U.S., Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007); Farmers Ins. Exch., 632 F.3d at 784. We take the words within the context of the contract as a whole, rather than in isolation. Gen. Convention on New Jerusalem in the U.S., Inc., 874 N.E.2d at 1087. Summary judgment is appropriate when the contract's plain terms unambiguously favor either side. Farmers Ins. Exch., 632 F.3d at 784 (citing Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998)).

Here there is no ambiguity in the mortgage's language; it is only susceptible to one meaning.  And, taking this language at face value, the mortgage's plain terms favor Barclays's reading of things.  We start with Section 4.00 of the mortgage, titled "RIGHTS AND REMEDIES ON DEFAULT," which spells out how Barclays may proceed upon a debtor's default.  It states: "If any such Event or Default occurs and is continuing, Mortgagee may, at its option, <u>do any one or more of the following</u>:" (emphasis added).  Seven different rights and remedies then follow in subsections 4.01 through 4.07, including the all important sections 4.05 and 4.06.  Each of these subsections contains an independent, complete thought and each ends with a period for punctuation.  The language "any one or more of the following" is not ambiguous.  To the contrary its meaning is quite plain.  Barclays had seven distinct options and could elect to employ a single one of those options or a combination thereof. Poynter's argument asks us to give no effect to the critical phrase "any one or more of the following" and we will not do this.  <u>See Farmers Ins. Exch.</u>, 632 F.3d at 785 (cautioning that no part of the contract is to be disregarded); <u>J.A. Sullivan Corp.</u> v. <u>Commonwealth</u>, 494 N.E.2d 374, 378 (Mass. 1986) (holding that "[e]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument") (internal quotation marks omitted).

-11-

Furthermore, nothing in the mortgage indicates that these seven distinct subsections under 4.00 are interconnected. The fact that each remedy is a separate subsection and is a complete thought, ending with a period and not a comma or a semicolon in fact compels the opposite conclusion. Lunt v. Aetna Life Ins. Co., 149 N.E. 660, 662 (Mass. 1925) (holding, in the analogous insurance policy-interpretation context, that "[p]unctuation may be resorted to as an aid in construction when it tends to throw light on the meaning") (internal quotation marks omitted).

Also significant, Section 4.05 does not reference any other subsection within Section 4.00, nor does Section 4.05 state that it applies to all sales pursuant to the mortgage. No other remedy within Section 4.00, including Section 4.06, makes reference to Section 4.05. This is unsurprising given that Section 4.05 and Section 4.06 serve different purposes. Section 4.05 is a contractual self-help remedy, whereas Section 4.06 allows the lender to use statutory remedies, which typically have their own notice and procedural requirements, making it unnecessary to restate them in the contract itself.

Had Barclays in fact intended to incorporate Section 4.05's notice requirements into other mortgage provisions, it could have done so just as it incorporated certain provisions into others elsewhere in the mortgage. For instance, Section 1.03 of the mortgage, which dictates that other liens cannot be placed on the

-12-

vessel, specifically references Section 2.04 and its minimum insurance limitations.  Similarly, Section 3.09 (contained in the "EVENTS OF DEFAULT" portion of the mortgage) incorporates other parts of the mortgage.  It provides: "Any Guarantor or other Obligor under the Obligations accured [sic] hereby shall take any action as outlined in Paragraph (3.07) above or shall have instituted against such person any action as outlined in Paragraph (3.08) above."[7]

Further undermining Poynter's position is the following. Section 5.00, named "OTHER AGREEMENTS ON DEFAULT OR OTHERWISE," contains ten subsections which further describe the parties' rights and responsibilities.  Subsection 5.09, "Powers and Remedies Cumulative," explains the breadth of remedial rights the mortgage confers on Barclays.  It states: "Each power or remedy herein given to the Mortgagee . . . shall be cumulative and in addition to every other power or remedy specifically given in this Mortgage or existing in admiralty, in equity, at law, or by statute."  Thus, according to Section 5.09, Barclays had at its disposal all rights afforded to it by law, whatever the source, which it could exercise singularly or in conjunction with its other rights.

Here all roads lead to the same conclusion.  Sections 4.01 through 4.07 gave Barclays multiple stand-alone options upon

_____

[7] Section 3.07 relates to the yacht owner being required to apply for bankruptcy.  Section 3.08 explains when an involuntary bankruptcy case will be filed against the owner.

default and, given these choices, it opted to conduct a sale under the Florida UCC pursuant to Section 4.06. The mortgage's plain, unambiguous terms make clear that 4.05's specific notice requirements do not extend to such sales under 4.06.[8] To interpret the mortgage otherwise would be to interpret it "in a way contrary to the plain and obvious meaning of its terms," which is something courts may not do. John Hancock Life Ins. Co. v. Abbott Labs., 478 F.3d 1, 7 (1st Cir. 2006) (internal quotation marks omitted).

## CONCLUSION

Since we find no merit to Poynter's claim that Barclays was required to comply with Section 4.05's notice proviso, we have no need to decide his follow-up contention that Barclays's failure to provide such notice should render it unable to collect the deficiency. For the above reasons, we affirm the district court's grant of summary judgment.

---

[8] Our finding that Barclays did not have to comply with Section 4.05's dictate brings our notice analysis to a close. We do not need to get into whether Barclays's sale, or specifically the notice it provided, complied with Florida's UCC. Poynter specifies in his brief that he does not question the mechanics of the actual sale but only contests Barclays's failure to give notice under 4.05. Though Poynter says he reserves the right to challenge the propriety of the sale, we are not sure where or when he is reserving it for since the district court granted summary judgment on liability and this is his appeal from that grant. But it suffices to note that Poynter has not raised the issue here and therefore we will not address it.

-14-