# United States Court of Appeals
## For the First Circuit

Nos. 12-2174, 13-1787

CARLA CRACCHIOLO, Individually and as Administratrix
of the Estate of Giuseppe Cracchiolo,

Plaintiff, Appellant,

v.

EASTERN FISHERIES, INC.; RCP REALTY,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

Joseph M. Orlando, with whom Brian S. McCormick and Orlando &
Associates were on brief, for appellant.
Mark W. Shaughnessy, with whom Anthony M. Campo, Matthew H.
Greene, and Boyle, Shaughnessy, & Campo, P.C. were on brief, for
appellees.

January 15, 2014

**LYNCH, Chief Judge**.   Shortly after midnight on January 28, 2011, Giuseppe Cracchiolo fell and drowned after slipping from an obviously hazardous place on a pier at a New Bedford fishery while attempting to return to the commercial fishing boat on which he was working.  His wife Carla Cracchiolo, acting individually and as administratrix of the estate, sued defendants RCP Realty and Eastern Fisheries, Inc. for damages for wrongful death based on a negligence theory.  These defendants are, respectively, the owner and the leaseholder of the facility where the ship was docked.  They were alleged to have failed to use due care in the inspection, maintenance, and repair of the premises and to have failed to provide Cracchiolo with a safe and reasonable egress from and ingress to the boat, particularly with respect to the ice and snow conditions on the pier that night.

The district court granted the defendants' motion for summary judgment on the basis that the defendants owed no duty of care to remedy the hazard under the circumstances of this case.  We reverse and remand.  We do not decide the duty of care issue.  We write narrowly and conclude the issue cannot be decided on the undisputed facts in this summary judgment record.

I.

Plaintiff filed suit against O'Hara Corporation, which owned the boat, under the Jones Act, 46 U.S.C. § 30104, and general maritime law.  She also brought tort claims under Massachusetts's

-2-

wrongful death statute, Mass. Gen. Laws ch. 229, § 2, against Eastern Fisheries, which operated the property where the boat was docked, and RCP Realty, which owned the property.

All three defendants moved for summary judgment on July 2, 2012.  Plaintiff opposed the motions, and the court held a hearing on the motions on August 15, 2012.  Trial was scheduled for September 17, 2012.  On September 6, 2012, at the final pretrial conference, the district court, in an oral order, denied O'Hara's summary judgment motion but granted Eastern Fisheries and RCP's. On September 11, 2012, plaintiff filed a motion for reconsideration, which was denied.[1]  Plaintiff appeals.

## II.

For purposes of summary judgment, we describe the facts in the light most favorable to the nonmovant, drawing all reasonable inferences in her favor.  See, e.g., Barclays Bank PLC v. Poynter, 710 F.3d 16, 19 (1st Cir. 2013).

A.        Layout of the Defendants' Property

Giuseppe Cracchiolo worked as a commercial fisherman and engineer on the F/V Sunlight, a herring boat.  During the winter, the Sunlight operated out of the defendants' fish processing facility in New Bedford, Massachusetts, and docked at the facility's pier.  The Sunlight paid a fee for use of that facility;

---

[1] On September 13, 2012, Plaintiff and O'Hara settled their case.  The district court retained supplemental jurisdiction over the claims against Eastern Fisheries and RCP.

the facility was used both for processing fish and for berthing vessels. At least thirteen vessels used the facility in 2010 and 2011.

The roughly rectangular waterfront property is enclosed by a chain link fence on its north, west, and south sides; the east side abuts the water. The property contains a fish processing plant, the front door of which faces the western side of the property, where there is a parking lot. At the back of the plant is a pier on the east side, where fishing vessels dock and in some instances offload their catches. The pier runs from north to south and a wooden cap board, about a foot wide, runs its length. There are bollards, for the boats to tie off their lines, located at various points along the pier, including near the south end. In the ordinary course, the entire length of the pier is used, including to tie the lines to the southern bollard. Scallop boats also unloaded near the southern end and occasionally stored nets in the area.

There are several feet of space between the plant and the fence on the north side, and a smaller grass-covered space of just a few feet between the plant and the fence on the south side. Between the fence on the western side, which has a large gate with a padlock, and the western door of the plant is a parking lot.

The fence along the south side did not go all the way to the water's edge; rather, it stopped two to three feet short of the

-4-

water's edge.  Importantly, the end of the fence had been folded back deliberately, leaving an obvious gap in the fence.  Access to the south side of the property, from the adjacent property, was easily obtained through the use of this gap.  This was the most direct way for crew members to get to the boats if the gate to the property was locked and they did not have keys.

The grass on the building's south side extends about ten feet north of the fence in the southeast corner.  Immediately to the north of the grassy area, an asphalt surface begins.  It goes across the pier from the south to the northeast corner of the property.  Along the eastern edge of the property, where the pier runs along the water, is a retaining wall.  The easternmost edge of the pier was covered by a wooden cap log.

Fishing vessels, including the _Sunlight_, tied off next to the plant at its pier and unloaded their fish catch into the building.  Sometimes another fishing vessel would be tied to the vessel tied to the dock.  This was true of the _Sunlight_ and its companion vessel.  The _Sunlight_ had used the pier since 2009.  The _Sunlight_ always tied off with its bow to the south and its stern to the north.  The boat would tie off using a bollard at the southern end of the pier near the bow.  The stern sat lower on the water than the bow and was roughly level with the pier.  As a result, crew members leaving the boat would ordinarily step off the _Sunlight_'s stern onto the pier.  By contrast, at the south end of

the boat, the bow rose an additional several feet above the pier. Crew members tying off the boat with the bow lines would walk to the southern end of the pier to do so. Scallop boats also unloaded their catches at the southern end of the pier. After leaving from the stern, crew members wanting to leave the property typically walked along a wide path on the north side of the property, between the processing plant and the fence, until reaching the parking lot on the western half of the property. They left through the gate. The reverse route, from the parking lot, along the north side of the property, and to the stern, would allow the crew to reboard the boat.

Apart from the gate at the front entrance, the other way into the property was through the obvious gap in the fence at the southeast corner. As the Sunlight's captain, Joseph Martin, testified, "[e]verybody knows you can go that way." Another crew member, Craig Lazaro, explained that the gap was "easy to see."[2] Captain Martin stated that although they knew the gap in the southeast corner existed, crew members would, "most of the time," enter the property through the main gate on the west side of the property.

---

[2] Eastern Fisheries' corporate representative, however, asserted that the company did not even know that the gap existed, much less that anyone walked through it to access the defendants' property. We disregard that denial of knowledge of access through the gap, as we must take the evidence in favor of the plaintiff.

Upon entering through the gap in the southeast corner of the fence, crew members could turn left and walk in the area between the fence and the fish processing building, back to the parking lot, past the building's front door, then take the path along the north side of the building to the stern of the boat. This was the longer of the two possible routes from the southeast corner.

Alternatively, a few crew members chose a shorter but more hazardous route. Instead of turning left, they walked straight ahead to the asphalt and continued along the waterfront retaining wall, to walk along the pier from the bow to the stern of the boat. Of necessity, those taking this route would have to walk for part of the way on the wooden cap log on the retaining wall alongside a raised platform attached to the rear of the building (known as a "takeout platform") used for scallop vessels. One of the defendants' security cameras covered the area.

In that particular area, the takeout platform extended out toward the water, leaving only a narrow space along the pier. That space was estimated to be about a foot in width. An individual taking this path would, on reaching the platform, turn sideways, try to hold on to the wall of the takeout platform, and step or shimmy alongside it on the retaining wall of the pier until past the platform and near the boat's stern. This route was significantly shorter than the option of turning left and walking

-7-

around the building to reach the boat's stern. It was defendants' policy and practice to remove snow from the parking lot, but the snow and ice removal ended there. Snow and ice were not removed from the pier, most of the adjacent northern walkway, or the grounds around the building.

Although it is clear that it was more dangerous to cross the retaining wall than to walk around the building, a jury could assess the degree of risk involved in doing so, as part of its assessment of the foreseeability that a seaman would use the route. It could consider the testimony of Captain Martin, who found the increased danger of use of the retaining wall so self-evident that he did not even consider walking along it. It could also consider the contrasting testimony of crew member Craig Lazaro, who testified that he twice crossed the retaining wall and "never even thought about" taking the alternate route around the building. In doing so, it could also consider the relative risks posed by ice and snow along the two routes.

B.        Crew Members' Past Patterns of Accessing the Property

Cracchiolo died after he took the route through the gap in the southeastern corner of the fence when he found the western gate locked and he did not have a key. There are a great number of facts in dispute as to how often such situations, which caused crew members to use the gap to enter the property, arose. It is unclear what Eastern Fisheries' policy was with respect to who would lock

the gate and when, as well as whether different policies applied when crew members were sleeping aboard boats docked at the facility. The evidence shows that the gate was locked sporadically at best, and may even have been unlocked the vast majority of the time. It further shows that crew members lost or broke their keys with some frequency, as Eastern Fisheries had to provide about twenty-five replacement keys per year to crew members of boats using its facility. It is also disputed how many spare keys, if any, were kept aboard the Sunlight, and whether Cracchiolo personally had one. We think it foreseeable that some crew members would not have keys with them and would enter the property through the gap in the fence when the gate was locked.

More important is the connection between foreseeable use of the gap in the fence to enter the property and the foreseeability, under the conditions that night, that seamen would choose not to turn left and go around the building, but to try to access the boat by walking straight from the southeast corner to the asphalt and along the pier's retaining wall to get to the stern of the boat on the pier's north side despite the obvious hazards. The record contains evidence of at least five instances in which crew members chose to use the southeast gap in the fence to enter the property. Captain Martin did so once. Significantly, when he did, he elected to turn left, walk along the south side of the processing plant to the parking lot, and then take the customary

route around the north side of the plant to the boat's stern. On the other hand, the record shows that on two of the five occasions when crew members used the gap in the fence, they accessed the boat via the retaining wall. Besides the night of Cracchiolo's death, in early January 2011, Lazaro and Dale Moore, a crew member of the companion ship to the Sunlight, had used the southeast gap, continued straight, and walked directly along the pier's retaining wall past the takeout platform to board the boat. Finally, later that month, Lazaro and Cracchiolo used that same route along the retaining wall on the night Cracchiolo died. We think it fair to infer the security cameras probably captured the uses of the hazardous route before the night Cracchiolo died.

C.      Particulars Regarding Cracchiolo's Death

The Sunlight docked at the New Bedford facility on January 26, 2011, after a fishing trip. A pipe on the boat had broken, and the crew decided to keep the boat docked at the plant for at least a few days while it was being repaired. Lazaro and Cracchiolo, the engineer, stayed on board to oversee the repairs. Defendants were aware that the boat would remain docked with crew members aboard during that period, and that the crew members would come and go from the property.

The defendants' property was covered in snow and ice on January 27, 2011. Photographs show that the parking lot had been plowed, and that the entire pier and the grassy areas were covered

in ice and snow. The retaining wall on the pier was likewise covered in ice and snow. In addition, there is some evidence that Eastern Fisheries workers also hosed down the takeout platform and parts of the pier that night, adding to the ice. The area between the processing plant and the fence along the entire southern side of the building was also covered in snow.

On the night of January 27, Cracchiolo and Lazaro left the facility together for dinner and drinks around 7:30 p.m. The main gate was open when they left but was locked when they separately returned, and neither brought with him a key to the gate. At some point in the night, the two men separated, and Lazaro took a cab back to the Sunlight. Lazaro wanted to return to the boat to get money to pay the cab driver. He found the gate locked and decided to walk in through the gap in the southeast corner of the fence. Once through the gap, Lazaro continued straight and walked along the waterfront retaining wall rather than turning left and walking around the fish processing building. The security footage shows Lazaro reaching the takeout platform, holding onto it, and side-stepping alongside it on the one-foot-wide retaining wall to get to the boat's stern. After getting past the takeout platform, Lazaro boarded the Sunlight, retrieved his money, walked back to the main gate along the northern route, and paid the cab driver through the fence. He returned to the boat

along the northern route he had just taken to the gate; that route was icy.

Some time later that night, Lazaro called Cracchiolo, who had not yet returned. He told Cracchiolo that the gate was locked. Cracchiolo asked how, then, to return to the boat. A jury could infer he did not have a key. Lazaro responded that Cracchiolo should come up into the property from the southeastern corner and he should continue walking along the retaining wall, the same way Lazaro had, to get to the boat. He also warned Cracchiolo that the path was icy. Cracchiolo told Lazaro that he was staying at a bar to watch the end of a basketball game and that Lazaro should not wait for him.

Cracchiolo eventually returned to the property just after midnight. The security footage shows that Cracchiolo entered from the southeastern side through the gap in the fence. Once inside, he continued straight ahead and began to walk along the pier to the retaining wall and takeout platform, as Lazaro had done. Security footage shows that as Cracchiolo was holding on to the takeout platform and trying to step sidewise along the retaining wall between the takeout platform and the Sunlight, he slipped and fell from the pier into the water. He drowned. Lazaro found Cracchiolo's body in the water the next morning and called the police. A later forensic examination measured Cracchiolo's blood alcohol level at 0.21 in one sample and 0.18 in another.

III.

We review the district court's summary judgment decision de novo.  See Barclays Bank PLC v. Poynter, 710 F.3d 16, 19 (1st Cir. 2013).

A.        Wrongful Death and Negligence

The Massachusetts wrongful death statute imposes liability against a "person who . . . by his negligence causes the death of a person."  Mass. Gen. Laws ch. 229, § 2.  Plaintiff's negligence theory in this case is that Eastern Fisheries and RCP violated their duty to remedy the hazard of snow and ice on the pier, particularly on the retaining wall at the takeout platform, from which Cracchiolo fell.

"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage."  Jupin v. Kask, 849 N.E.2d 829, 834-35 (Mass. 2006).  The questions of breach, damages, and causation are "the special province of the jury."  Id. at 835.  However, the question of whether the defendant owed a duty of care in the first instance is an issue of law, and may be settled on summary judgment if (on the undisputed facts) the risks posed by the defendant's actions were not "foreseeable."  Id.  Massachusetts courts may also make this determination after trial, in light of all of the evidence.  See

<u>Dos Santos</u> v. <u>Coleta</u>, 987 N.E.2d 1187, 1198 (Mass. 2013) (finding evidence sufficient to allow jury to impose duty of care based "[o]n the[] facts" established at trial).

B.        <u>Massachusetts Snow and Ice Cases</u>

The Massachusetts courts have established fairly clearly the obligations of landowners to remove snow and ice accumulations on their property.  In <u>Soederberg</u> v. <u>Concord Greene Condominium Ass'n</u>, 921 N.E.2d 1020 (Mass. App. Ct. 2010), the Massachusetts Appeals Court concluded that landowners do have a duty to remove snow and ice accumulations even though those accumulations present open and obvious hazards to visitors.  The court explained that the open and obvious nature of the hazard does not "negate[] an owner's duty to remedy the hazard."  <u>Id.</u> at 1024.  Rather, a landowner must remedy snow and ice hazards where he "can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger."  <u>Id.</u> (quoting <u>Restatement (Second) of Torts</u> § 343A cmt. f) (internal quotation marks omitted).  The court further explained that a plaintiff's unreasonable decision to encounter an ice hazard could bear on the issue of comparative negligence, <u>see id.</u> at 1025, but that this is a jury question and that the plaintiff's unreasonable behavior will not bar recovery as a matter of law even where other options that avoided the ice hazard were available, <u>see id.</u> at 1024.

-14-

The SJC further developed the law in this field in Papadopoulos v. Target Corp., 930 N.E.2d 142 (Mass. 2010). In Papadopoulos, a customer in the defendant's parking lot slipped and fell on a patch of ice that either fell from a snow pile or melted off the pile and refroze. The customer sued for negligence, and the trial court granted summary judgment in favor of defendants on the ground that the ice was a natural accumulation. Id. at 144. The SJC reversed and remanded. It held that the proper consideration was not whether the snow and ice accumulation was natural or unnatural, but rather whether the landowner had made the premises reasonably safe for lawful visitors. See id. at 150. In reaching that holding, the SJC emphasized the distinction between the duty to warn of dangers and the duty to remedy them. The duty to warn, the court reasoned, was typically obviated in snow and ice cases by the fact that the hazard was open and obvious, so a warning "would be superfluous." Id. at 151. It then explained, citing Soederberg, that the duty to remedy the danger remained when it was foreseeable that visitors would choose to encounter a hazard despite the open and obvious risks it posed. Id. The court reiterated:

> It is not reasonable for a property owner to leave snow or ice on a walkway where it is reasonable to expect that a hardy New England visitor would choose to risk crossing the snow or ice rather than turn back or attempt an equally or more perilous walk around it.

<u>Id.</u> (citing <u>Soederberg</u>, 921 N.E.2d at 1025). The court concluded by holding that snow and ice accumulations trigger the same duty to remedy as other dangerous conditions -- namely, the duty to "make reasonable efforts to protect lawful visitors against the danger." <u>Id.</u> at 154.

C.       <u>Massachusetts Duty of Care Cases</u>

<u>Dos Santos</u>, though not a snow and ice case, provides further guidance for us here.[3] Like <u>Dos Santos</u>, this case alleges not a duty to warn,[4] but a duty to remedy a hazardous condition. <u>Dos Santos</u> involved a question not merely of foreseeability of a risk posed by a hazard, but the foreseeability of a risk posed by an open and obvious hazard. <u>Dos Santos</u> explained that a landowner "is not relieved from remedying an open and obvious danger where [the landowner] can and should anticipate that the dangerous condition will cause physical harm to the [lawful visitor] notwithstanding its known or obvious danger." 987 N.E.2d at 1192 (alterations in original) (quoting <u>Papadopoulos</u>, 930 N.E.2d at 151)

---

[3] <u>Dos Santos</u>, we should note, was decided after the parties in this case submitted their summary judgment papers. In fact, <u>Dos Santos</u> was decided after defendants had already been granted summary judgment and plaintiff had moved for reconsideration, but one week before the district court denied that motion.

[4] Landowners ordinarily have no duty to <u>warn</u> of hazards where the warning "would be superfluous for an ordinary intelligent" visitor. <u>Papadopoulos</u>, 930 N.E.2d at 151.

(internal quotation marks omitted).  In this, Massachusetts has adopted the Restatement (Second) of Torts § 343A, comment f.[5]

In Dos Santos, the court considered the scope of a landowner's duty to remedy under § 343A of the Restatement.  The Dos Santos court endorsed the conclusion that a landowner can and should anticipate a particular harm on a finding that a reasonable man in plaintiff's position would conclude the advantages of encountering the danger would outweigh the apparent risk.  987

---

[5] This comment in the Restatement provides:

There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger.  In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection.  This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.

Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it.  Such reason may also arise where the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.  In such cases the fact that the danger is known, or is obvious, is important in determining whether the invitee is to be charged with contributory negligence, or assumption of risk.  (See §§ 466 and 496D.)  It is not, however, conclusive in determining the duty of the possessor, or whether he has acted reasonably under the circumstances.

Restatement (Second) of Torts § 343A cmt. f.

-17-

N.E.2d at 1193. But it went on to say that "application of § 343A is not limited to situations where the plaintiff encounters the danger only after concluding the benefit of doing so outweighs the risk." Id.

The court recognized that § 343A contemplates that a lawful entrant's encounter with an open or obvious hazard may in some instances be a result of the entrant's own negligence. But even if the plaintiff was negligent, "[a] plaintiff's own negligence in encountering the danger does not relieve the landowner of a duty to remedy that danger where the plaintiff's negligent act can and should be anticipated by the landowner." Id. at 1195. While Massachusetts recognizes comparative negligence, that does not necessarily negate a defendant's duty of care. See, e.g., Soederberg, 921 N.E.2d at 1025.

Dos Santos held it was error for the trial court to instruct the jury that there was no duty of care merely because the risk of injury was obvious to visitors. It explained that the defendant had set up a trampoline next to a shallow inflatable pool with the specific intent to enable the use that resulted in the injury, and the defendant knew both that the trampoline and pool were in fact being used in this manner and that the use was dangerous. Dos Santos, 987 N.E.2d at 1189-90. The SJC remanded the case with directions to the trial judge to instruct the jury that "a landowner is not 'relieved from remedying open and obvious

dangers where he [or she] can or should anticipate that the dangerous condition will cause physical harm to the [lawful entrant] notwithstanding its known or obvious danger.'" Id. at 1198 (alterations in original) (quoting Soederberg, 921 N.E.2d at 1024).

We agree with defendants that unlike Dos Santos, this is not a case in which the landowner expressly created a hazard in the form of the narrowing of the space caused by the takeout platform to induce activity which foreseeably would cause injury. It is clear that the defendants did not intend this route to be a pathway and in fact had an established pathway to the pier and the boat along the northern side of the property. This is an important distinction. But we do not think this distinction entitles defendants to summary judgment for at least three reasons.

First, even though the property owner in Dos Santos expressly created the hazard (hoping to benefit from it) and obviously knew of the hazard, the SJC did not itself declare there was a duty of care in that case but remanded for a new jury trial, considering the issues to be ones for a jury to resolve under particular instructions. Thus, the intentional placement of the trampoline in Dos Santos was not dispositive.

Second, defendants would be wrong to distinguish Dos Santos's emphasis on the defendant's own conduct as eliminating the foreseeability analysis aspect of duty of care cases. The Dos

-19-

<u>Santos</u> court did not treat the landowner's specific intent that visitors would use the trampoline as a separate element of its holding.  <u>Dos Santos</u> continued to focus on foreseeability and not on intent as the ultimate issue.  That is particularly so given <u>Dos Santos</u>'s reliance on § 343A of the Restatement, which does not discuss intent at all and focuses solely on whether the landowner "should anticipate the harm" despite its obviousness.  <u>Restatement (Second) of Torts</u> § 343A; <u>see</u> <u>also</u> <u>id.</u> cmt. f (explaining that landowner "is not relieved of the duty of reasonable care" when he "can and should anticipate that the dangerous condition will cause physical harm" despite its obviousness).  <u>Dos Santos</u> used the intent of the landowner as a means to show that the landowner there "would surely have reason to anticipate that persons would use" the hazardous condition "despite the danger."  987 N.E.2d at 1197.

Third, such a reading would be inconsistent with prior Massachusetts case law, cited in <u>Dos Santos</u>.  We draw guidance from <u>Jupin</u>, 849 N.E.2d at 829, and from <u>Quinn</u> v. <u>Morganelli</u>, 895 N.E.2d 507 (Mass. App. Ct. 2008), <u>cited by</u> <u>Dos Santos</u>, 987 N.E.2d at 1192-93, 1195, 1196.  In <u>Jupin</u>, the court reversed the entry of summary judgment for the defendant, rejecting the holding that the defendant did not have a duty of care.  There, the property owner was held to owe a duty of care to a police officer shot with a gun taken from the owner's property when she had not ensured proper storage of the gun despite knowing that an individual with a

-20-

history of violence and mental instability had a key to her house. 849 N.E.2d at 837-38. The court stressed foreseeability, id. at 836, and that there was no public policy reason not to impose a duty of care.

In Quinn, the plaintiff sued defendant landowners after falling from a hallway into a sunken living room. The hallway and the living room were covered in the same color tile, which plaintiff alleged created a hazard that the landowners had a duty to warn of or to remedy. The Massachusetts Appeals Court reversed the trial court's grant of summary judgment to the defendants. Quinn, 895 N.E.2d at 511. It explained that a jury would be able to conclude that the step created a foreseeable hazard, even though the record contained evidence of only one other person having ever fallen on it in the roughly twenty years since it was constructed. Id. at 508-09. The court went on to note that the jury could find the hazard open and obvious, that the record was "insufficiently developed" on that issue, and that the proper solution was to reverse the entry of summary judgment and remand for further proceedings, which could include a special verdict or interrogatories submitted to the jury. Id. at 511. Further, in Soederberg, the court explained that "whether a plaintiff's own conduct in encountering an ice hazard should bar recovery [is] generally a question for the jury to decide." 921 N.E.2d at 1024.

IV.

With these principles in mind, although the question is close, we conclude that this case is not suitable for resolution on summary judgment. The record contains too many disputes of fact and too many disputed inferences, as in Quinn. The record does not establish that the defendants did not have any reason to anticipate crew members would attempt to cross the icy pier in this manner as the shortest way to get back to the boat. A factfinder could infer that the landowners here knew the gap in the fence existed and knew the gap was used: it was obvious to observers. It was also foreseeable that the front gate would sometimes be locked and prevent crew members without keys from entering that way. Indeed, Eastern Fisheries had to provide some twenty-five replacement keys per year to crew members who needed a key to enter the property by means other than the gap.

The most difficult issue is whether the defendants knew or should have known that crew members would use the more hazardous route, particularly in these conditions -- that is, whether it was insufficiently foreseeable such that we may say as a matter of law there was no duty of care.

Defendants argue that the record contains evidence of only two prior uses before the night in question, and that this is insufficient as a matter of law to put them on notice that crew members might use it to cross the pier. We disagree with

-22-

defendants for three reasons. The first is that as a matter of law in Massachusetts, notice of even a single instance years before was relevant to defeat summary judgment in the Quinn case. See Quinn, 895 N.E.2d at 511. The record here on prior use goes farther than that in Quinn. For example, the two prior uses of the route across the pier involved crew members of two different vessels, who may have told others. The prior uses were also during the winter, and they were recent, occurring roughly one month before the night of Cracchiolo's death. Additionally, a factfinder could infer that the two instances in the record were only a partial sampling. Lazaro alone had entered through the gap twice in two winter seasons at the facility, and other crew members on both the Sunlight and the dozen or more other vessels that used the facility might have done the same. A factfinder could also consider that the individuals entering through the gap were crew members on commercial fishing vessels, who would have had experience and confidence walking along slippery, waterside conditions, as that was inherent in their jobs.

Second, while actual knowledge of a particular prior use is surely sufficient to prove that a landowner had "reason to anticipate" that use, Dos Santos, 987 N.E.2d at 1197, actual knowledge is not necessary; liability exists if the defendant should have known about the use. See, e.g., Papadopoulos, 930 N.E.2d at 154 (imposing duty to remedy "[i]f a property owner knows

-23-

or reasonably should know of a dangerous condition"). A factfinder could infer that the landowners knew or should have known the gap in the fence existed and was used, and that no obstacle except self-restraint prevented crew members from taking the risky route to the boat that Cracchiolo took. A factfinder might also conclude that the defendants were not negligent in relying on crew members to exercise such self-restraint.

Third, the disputes as to inferences and insufficient development of the record counsel against resolution of the duty of care issue on summary judgment. See Quinn, 895 N.E.2d at 511; see also Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 80-81 (1st Cir. 2008); Merino Calenti v. Boto, 24 F.3d 335, 340 (1st Cir. 1994) (reversing summary judgment where record was inadequate to allow determination of issues). In light of Dos Santos, Jupin, and Quinn and the many disputes of fact and of inferences to be drawn, and acknowledging the difficulty of the issues, we think the landowners are not entitled to summary judgment, as a matter of law, on this record.

On remand, the district court has discretion to submit the issue of foreseeability to the factfinder by using a special verdict, cf. Quinn, 895 N.E.2d at 511, or to allow further development of the record.

-24-

## V.

For the reasons stated above, we <u>reverse</u> and <u>remand</u>. No costs are awarded.