# United States Court of Appeals

## For the First Circuit

Nos. 04-2365, 04-2366

REED & REED, INC.; ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

Plaintiffs, Appellees/Cross-Appellants,

v.

WEEKS MARINE, INC.,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Dyk,[*] Circuit Judges.

Leonard W. Langer with whom Marshall J. Tinkle and Tompkins,
Clough, Hirshon & Langer, P.A. were on brief for defendant.
David J. Perkins with whom Perkins Olson, P.A. was on brief
for plaintiffs.

December 19, 2005

---

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN**, **Chief Judge**. During a construction project, a barge owned by one project subcontractor, Weeks Marine, Inc. ("Weeks"), collided with underwater railways located on the property of another project subcontractor, Reed & Reed, Inc. ("Reed"). The ultimate question on this appeal is whether a damage claim against Weeks by Reed and its insurer is barred by a so-called waiver-of-subrogation provision embedded in the complex contractual scheme governing the project.

In 1998, Bath Iron Works ("BIW") and Clark Builders of Maine ("Clark") entered into a construction contract ("BIW-Clark contract") to build a land-level transfer facility for BIW on the Kennebec River. Clark subcontracted with Atkinson Construction ("Atkinson"), which in turn subcontracted work separately to Callahan Brothers ("Callahan") and Weeks. Callahan--a union-labor affiliate of Reed--entered into a subcontract with Reed, engaging Reed to construct marine railway tracks ("ways") in a riverside yard owned by Reed across the river from the main BIW facility.

Callahan intended to use the Reed ways to move a number of large concrete blocks (called "landing grids"), weighing about 400 tons each, into the Kennebec River for transport by Weeks to the main construction site for use as dry-dock supports. Callahan also separately leased from Reed the yard in which the ways were to be built. Thus, Callahan could manufacture the grids at Reed's yard and transport them to the river via the constructed ways.

-2-

Weeks would then pick up the grids from the river end of the ways and transport them across the river by barge.

After the ways were completed in the summer of 2000, the barge transports commenced. During one of the transports, occurring on October 11, 2000, the Weeks barge damaged the submerged ways; the ways, although part of the leased yard, remained Reed's property and were available for future use by Reed in its own right. The damage was repaired, and the transfers continued. In due course, the damage caused by Weeks to Reed's ways was reimbursed by Reed's property insurer, St. Paul Fire and Marine ("St. Paul").

Reed and St. Paul then brought suit in district court against Weeks, and after a bench trial, the court found Weeks liable for negligence, awarding Reed and St. Paul $298,100 in damages--the amount the court found necessary to restore the ways to their pre-collision condition. Weeks now appeals from the judgment; Reed cross-appeals (an unnecessary step) to support the judgment on alternative grounds not adopted by the district court.

In the district court, much of the controversy centered around a waiver-of-subrogation clause invoked by Weeks as barring recovery by Reed (and therefore by St. Paul as the subrogee standing in Reed's shoes). The clause was contained in Exhibit E to the Atkinson-Callahan contract and provided as follows:

> 10. Waiver of Subrogation - To the extent that a loss is covered by insurance in force, and

recovery is made for such loss, the BIW and Contractor and Subcontractor's [sic] hereby mutually release each other from liability and waive all rights of subrogation and all rights of recovery against each other for any loss insured against under their respective policies (including extended coverage), no matter how caused, it being understood that the damaged party will look solely to its insurer for reimbursement. BIW shall require all Subcontractors to similarly waive their rights of subrogation in each of their respective construction contracts with respect to the work.

Exhibit E, obscurely drafted in the tradition of insurance policies and related documents, described a BIW-controlled insurance regime for subcontractors on the project but also contemplated that some subcontractors might not be covered by this regime and imposed separate requirements upon them. It is unclear whether the waiver provision, placed between provisions directed at the two different groups, applied to both groups or only the former.

Even greater confusion attended the question whether Exhibit E, whatever its meaning as to covered parties, applied to Reed at all. It was not attached to the Callahan-Reed contract, nor was it specifically mentioned in that contract. Weeks, however, asserted that Exhibit E bound Reed because of language in the Callahan-Reed contract that stated, inter alia, that

the GENERAL CONTRACT documents are incorporated in this agreement by this reference, with the same force and effect as if same were set forth at length herein; and that the SUBCONTRACTOR will be bound by any

and all contract documents insofar as they relate in any part or in any way, directly or indirectly, to the work covered by this agreement.[1]

Whether Exhibit E constituted one of the "general contract documents" was disputed.

Following a bench trial, the district court made a number of findings that strongly suggested that the waiver provision would apply to Reed for any damage that occurred to Reed's property in the course of its work under the Callahan-Reed contract. However, the district court also concluded that the damage had occurred <u>after</u> Reed had completed its basic work (construction of the ways), and that the waiver provision had no effect on Reed's rights as a property owner to collect from Weeks for damage later caused by Weeks to Reed's property.

On appeal, Weeks urges that the district court read the waiver provision too narrowly. Reed not only defends the district court's rationale for deciding in Reed's favor, but also argues that it (Reed) was never bound by Exhibit E at all, or, if it was, that the waiver provision did not apply because Reed was not part

---

[1]A companion provision in the Callahan-Reed contract stated:

Except as modified by this Subcontract, Subcontractor agrees to adhere to and be bound to the Contractor by all of the provisions of the General Contract and to the contract documents affecting subcontractor's work hereunder, and, insofar as its work is concerned, to assume towards the Contractor all of the duties, obligations and liabilities that the Contractor assumes toward the Owner.

-5-

of the BIW-controlled insurance program (and--Reed asserts--the waiver applied only to such participants).  Weeks contests these propositions and, among other assertions, argues that Callahan and Reed are alter egos.

It is uncertain whether this tangled dispute, with its idiosyncratic documentation, has a "right" answer in any meaningful sense, and given the litigation expenses, it is a mystery why it was not settled.  Still, it must now be decided.  As to construction of contract language, our review is plenary, Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000), but as to application, some deference is due to the factfinder, Bolton v. Taylor, 367 F.3d 5, 7-8 (1st Cir. 2004).

In our view, the principle embodied in the district court's reading of the waiver provision is correct and its application to these facts, although a close call, should be sustained.  For the purposes of analysis, we assume arguendo that Exhibit E was incorporated into the Callahan-Reed contract so far as it might be applicable to the present dispute.[2]

---

[2]The district court found that the "general contract" referred to in the Callahan-Reed contract is the Atkinson-Callahan contract (rather than the BIW-Clark contract), and that Exhibit E was incorporated as a whole into this contract.  The district court did not address the separate Reed claim that even if Exhibit E does apply, it applies only to subcontractors enrolled in the BIW-sponsored insurance program--an issue not easily resolved on this record.

Even if Exhibit E applied to Reed, however, it waived Reed's rights against Weeks <u>only insofar as they were within the scope of the provision</u>.  In delineating the scope of the waiver provision, the district court held that the waiver would apply only to claims related to Reed's work under the Callahan-Reed contract. It stressed that the contract by its explicit terms incorporated provisions associated with the general contract only so far as they "relate[d]" to or "affect[ed]" Reed's "work" for Callahan.

Weeks' broadest argument to the contrary is that the waiver provision blocks any claims by Reed against Weeks (at least so far as they are covered by insurance); but this ignores the "related"/"affected" language.  Weeks claims, in its reply brief, that the "related to" language does not modify or delimit the incorporation of the "general contract" to which Exhibit E is an annex; but a careful reading of the Callahan-Reed contract indicates otherwise.

Weeks' argument turns upon the fact that the incorporation provisions quoted above (<u>see</u> note 1 above and accompanying text) use the related/affected phrases to qualify "contract documents," and Weeks says that this does not include the "general contract" itself.  Yet this distinction is debatable as grammar and artificial in substance.  Furthermore, the phrase "insofar as its [Reed's] work is concerned" in the closing sentence of the second incorporation provision (note 1, above) is clearly

addressed to the "duties, obligations and liabilities" imposed pursuant to the general contract.

Weeks' argument also proves too much. Suppose that two years after Reed had finished all association with the BIW project, a Weeks barge in the middle of the river slipped loose and eventually drifted into Reed's ways, damaging them again. It could hardly be thought that such an incident was covered by a waiver clause framed to govern work that Reed had long completed. Thus, at most, the waiver provision applies to claims by Reed related to or arising out of the work that Reed contracted to perform under the Callahan-Reed contract.

Even so narrowed, it is a close question whether the incident is sufficiently tied to Reed's contracted-for work to come within the waiver provision. The district court found as follows:

> By October 11, 2000, Reed & Reed had completed the ways and therefore completed the work covered by its subcontract with Callahan. Reed & Reed's claim in this lawsuit stems not from any injury it suffered as a subcontractor building the ways, but from an injury it suffered as property owner.

After Reed completed its work, the district court stated, it was merely a property owner renting its yard and ways to Callahan and "Reed did not waive its right as a property owner to recover for damage negligently inflicted upon its property" by Weeks.

In Weeks' favor is Maine case law supporting a generous reading of waiver-of-subrogation clauses in the interest of

avoiding litigation--a central aim of such clauses. See, e.g., Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp., 868 A.2d 220, 225-27 (Me. 2005); Willis Realty Assocs. v. Cimino Constr. Co., 623 A.2d 1287, 1288 (Me. 1993). This is reinforced by some language in the incorporation clauses that extends all contract provisions to Reed "insofar as they relate in any part or in any way, directly or indirectly, to the work covered by" the Callahan-Reed contract.

Yet what that "work" encompassed remains in dispute. According to Reed, its work was to construct the ways. According to Weeks, even though Reed had completed its basic task of building the ways well before the October 11 accident, it had ongoing ancillary duties (e.g., to repair defects in its work found within one year), and--Weeks argues--Reed's own conduct after it had completed construction shows that its "work" had not been completed at the time of the accident.

The contract language itself is not especially helpful to Weeks. Nearly all of the items listed in the scope of work clause clearly deal with the construction and general setup of the ways; none directly references any sort of post-construction duties. The duty-to-repair-defects provision does extend beyond the completion of the ways, but it is a limited, contingent obligation, and the district court's findings as to the cause of the accident attribute

it to Weeks' negligent operations, not to any defect in the original construction.

This brings us to Weeks' claim that Reed's actual conduct showed that its work extended beyond the completion of the ways. "The parties to an agreement know best what they meant," Restatement (Second) of Contracts § 202 cmt. g (1981), and thus the parties' subsequent course of performance may be instructive in contract interpretation. Id. § 202(4). But much of Reed's post-construction conduct, such as sending construction details to Atkinson and permitting Atkinson to shorten one of the ways (both completed prior to the October 11 incident), could as easily be taken to demarcate the completion of Reed's own work.

Weeks argues that Reed was involved in more substantial post-construction activities, such as monitoring the loading of the grids and assisting Weeks in the loading process. The record is far from clear as to whether Reed in fact took part in such activities. Given the deference due to the factfinder, we accept the district court's characterization.

In sum, by the time of the accident, Reed had completed the ways and merely permitted the use of its ways for the launching of the concrete blocks. This latter engagement was not done in the performance of the Callahan-Reed contract; there is nothing whatsoever in that contract about such an obligation. Reed's ways were made available to Callahan for launching the grids or for any

-10-

other purpose by virtue of Callahan's separate lease of the yard from Reed--a lease that (as the district court pointed out) contains no waiver-of-subrogation clause.

The outcome admittedly turns on formalities: the formal corporate separation of two close affiliates--Callahan and Reed--and the formal separation of Reed's construction work _for_ Callahan from its lease of its property _to_ Callahan. These separations, in turn, derived in part from the irrelevant fact that Reed was a non-union contractor; otherwise, Reed might have contracted directly with Atkinson to build the ways and launch the grids.

Weeks contests the respect given to the formal separation between Callahan and Reed, arguing that two passages in its post-trial brief to the district court raised a veil-piercing claim. These passages--which contain only passing references to the possibility that Reed and Callahan may not be independent entities--do not represent a developed argument. The veil-piercing argument is thus unavailable on appeal. _Daigle_ v. _Me. Med. Ctr., Inc._, 14 F.3d 684, 687 (1st Cir. 1994).

Finally, focusing upon the Callahan-Reed lease, Weeks argues that the lease required Callahan, not Weeks, to indemnify Reed for any damage to the yard (including the ways), and did not give Reed a right of action against anyone other than Callahan. On the contrary, Reed was not obliged to collect from Callahan, and the lease did not surrender potential Reed claims against third

parties.  As the owner, Reed was free (so far as the lease was concerned) to sue anyone who negligently damaged its yard or ways.

Affirmed.