# United States Court of Appeals
## For the First Circuit

No. 13-1220

FRIENDS OF MERRYMEETING BAY and ENVIRONMENT MAINE,

Plaintiffs, Appellants,

v.

HYDRO KENNEBEC, LLC and BROOKFIELD POWER US ASSET MANAGEMENT, LLC,

Defendants, Appellees.

No. 13-1750

FRIENDS OF MERRYMEETING BAY and ENVIRONMENT MAINE,

Plaintiffs, Appellants,

v.

MERIMIL LIMITED PARTNERSHIP, FPL ENERGY MAINE HYDRO, LLC, and BROOKFIELD RENEWABLE SERVICES MAINE, LLC,

Defendants, Appellees,

NEXTERA ENERGY RESOURCES, LLC and NEXTERA ENERGY MAINE OPERATING SERVICES, LLC,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

---

Before

Thompson, Stahl, and Kayatta,
<u>Circuit Judges</u>.

---

<u>Charles C. Caldart</u>, with whom <u>Joshua R. Kratka</u>, <u>Bruce M. Merrill</u>, <u>David A. Nicholas</u>, and <u>National Environmental Law Center</u> were on brief, for Appellants.
  <u>Mark Stancil</u>, with whom <u>Donald A. Carr</u>, <u>Aileen Meyer</u>, and <u>Pillsbury Winthrop Shaw Pittman LLP</u> were on brief, for Appellees.

---

July 14, 2014

---

**STAHL, Circuit Judge**. Two conservation groups, Friends of Merrymeeting Bay and Environment Maine (collectively, "Plaintiffs"), brought two citizen enforcement suits containing claims under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, against Hydro Kennebec, LLC, Brookfield Power US Asset Management, LLC, Merimil Limited Partnership, FPL Energy Maine Hydro, LLC, and Brookfield Renewable Services Maine, LLC. (collectively "Defendants"),[1] who operate four hydroelectric dams ("Dams") on the Kennebec River. The district court entered summary judgment in favor of Defendants as to the CWA claims in both cases below, and Plaintiffs appeal those rulings.[2] For the following reasons, we vacate and remand.

---

[1] The two lawsuits below (case numbers 11-cv-35 and 11-cv-38) have been consolidated on appeal. Case number 11-cv-38 included additional defendants NextEra Energy Resources, LLC and NextEra Energy Maine Operating Services, LLC, but they are not parties to the appeal.

[2] In both district court cases, the ESA claim was Count I and the CWA claim was Count II. In case number 11-cv-35, the district court granted Defendants' motion to dismiss Count I. Friends of Merrymeeting Bay v. Brookfield Power US Asset Mgmt., No. 11-cv-35-GZS, 2013 WL 145506, at *2-4 (D. Me. Jan. 14, 2013). In case number 11-cv-38, the district court denied Defendants' motion for summary judgment as to Count I. Friends of Merrymeeting Bay v. NextEra Energy Res., LLC, No. 11-cv-38-GZS, 2013 WL 145733, at *2-4 (D. Me. Jan. 14, 2013). In the present appeal, Plaintiffs only challenge the district court's rulings as to Count II, the CWA claim.

## I.  Background

The facts of this case are set forth in detail in the district court's opinions.  <u>Friends of Merrymeeting Bay</u> v. <u>Brookfield Power US Asset Mgmt.</u>, No. 11-cv-35-GZS, 2013 WL 145506, at *2–4 (D. Me. Jan. 14, 2013);[3] <u>Friends of Merrymeeting Bay</u> v. <u>NextEra Energy Res., LLC</u>, No. 11-cv-38-GZS, 2013 WL 145733, at *2–4 (D. Me. Jan. 14, 2013).  We briefly reiterate them here only as necessary to provide context for the issues on appeal.

The crux of the matter is that certain endangered species of fish, including Atlantic salmon, pass through Defendants' Dams when they migrate down the Kennebec River to the sea.  Each Dam operates under the terms of water-quality certifications issued by the state of Maine pursuant to Section 401 of the CWA, 33 U.S.C. § 1341.  All of the Dam's certifications incorporate the provisions of the Kennebec Hydro Developers Group Settlement Agreement ("Settlement Agreement"), which Defendants (among other operators of hydroelectric projects) entered into in 1998 with various federal and state agencies ("Agencies").

The Settlement Agreement allows for two basic methods of downstream fish passage, either through the turbines of the Dams or

---

[3] In case number 11-cv-35, the district court issued two orders on the same day.  The first order, cited above, recounts the facts of the case and rules on Defendants' motion to dismiss.  The second order granted summary judgment for Defendants as to Count II.  <u>Friends of Merrymeeting Bay</u> v. <u>Brookfield Power US Asset Mgmt.</u>, No. 11-cv-35-GZS, 2013 WL 145580, at *4 (D. Me. Jan. 14, 2013).  It is the second order from which Plaintiffs appeal.

around the turbines by various bypass methods.  It further provides that:

> to the extent that licensee desires to achieve interim downstream passage of out-migrating adult Atlantic salmon and/or adult shad by means of passage through turbine(s), licensee must first demonstrate, through site-specific qualitative studies designed and conducted in consultation with the resource agencies, that passage through turbine(s) will not result in significant injury and/or mortality (immediate or delayed).

After entering into the Settlement Agreement, Defendants, in consultation with the Agencies, constructed diversionary facilities to take the fish around the turbines at all four of the Dams.

Plaintiffs filed a two-count complaint in each case on January 31, 2011, alleging that endangered fish continue to pass through the Dams' turbines despite the construction of the diversionary facilities, resulting in injury and death to some of the fish.  Plaintiffs claimed in Count I that the fish casualties amounted to an illegal "taking" of an endangered species in violation of the ESA.  In Count II, Plaintiffs argued that Defendants are in violation of their water-quality certifications, and thus the CWA, because they have not conducted the "site-specific quantitative studies" ("Studies") that are required if Defendants desire passage of the fish through the turbines. According to Plaintiffs, evidence in the record shows that Defendants' diversionary facilities are ineffective, and that Defendants know they are ineffective, which raises a question of

fact about whether Defendants desire at least some of the fish to pass through the turbines.

The district court entered summary judgment in favor of Defendants on Count II in both cases. We find that the district court erred by entering judgment in favor of Defendants without properly considering the record as a whole in the light most favorable to Plaintiffs. We therefore vacate and remand for further proceedings consistent with this opinion.

## II. Analysis

We review the district court's summary judgment decision de novo. Cracchiolo v. E. Fisheries, Inc., 740 F.3d 64, 69 (1st Cir. 2014). The dispositive issue with respect to the CWA claim is a question that is straightforward to pose but not particularly easy to answer: do the Defendants "desire to achieve" passage of the endangered fish through the turbines? If so, Defendants must conduct the Studies in order to remain compliant with the terms of the Settlement Agreement.

The district court decided as a preliminary matter that the relevant language in the Settlement Agreement is unambiguous. Friends of Merrymeeting Bay, 2013 WL 145733, at *14.[4] It interpreted the word "desire" according to its commonly understood meaning — "to want" – equivalent to a party's subjective intent.

---

[4] Although there are two district court opinions below, the analysis of the CWA claim in each is identical.

Id.  The district court then categorically rejected Plaintiffs' evidence related to: (1) whether fish were in fact passing through the turbines; (2) and whether Defendants knew fish were passing through the turbines.  On the grounds that "[k]nowledge does not equate to desire," the district court held that Plaintiffs' evidence related to those two topics was "not germane to the [c]ourt's inquiry."  Id.  Reviewing the portion of the record that remained, the district court concluded that the "evidence . . . on summary judgment reveals that Defendants do not desire to pass [endangered fish] through the turbines."  Id.

We agree that the language of the Settlement Agreement is not ambiguous, and that the common meaning of the word "desire," corresponding to a party's subjective intent, should apply. Questions of intent in the context of contract interpretation often arise when the language of a contract is ambiguous and we must determine the parties' intended meaning.  That is not the question here.  Instead, the unambiguous contractual language in this case presents a factual question regarding the subjective intent underlying Defendants' conduct pursuant to the contract.

This type of question does not appear to arise frequently in contract disputes.  Questions of the intent underlying a party's conduct are more common in other contexts, such as employment discrimination suits.  We have not found another case specifically analogous to this one, where a party's subjective desire for a

-7-

particular outcome triggers the application of a contractual provision.

Nevertheless, certain principles apply when a district court resolves questions about a party's underlying intent at the summary judgment stage, regardless of the specific doctrinal context. We have held that courts should "use special caution in granting summary judgment as to intent. Intent is often proved by inference, after all, and on a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party." Daniels v. Agin, 736 F.3d 70, 83 (1st Cir. 2013). But even when "elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir. 2007) (internal quotation mark omitted).

In determining whether Plaintiffs introduced sufficient evidence to survive summary judgment, the district court "examines the entire record in the light most flattering to the nonmovant and indulg[es] all reasonable inferences in that party's favor." Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997) (internal quotation marks omitted). This review of the record is limited, however, to evidence that "would be admissible or usable at trial." Asociacion de Periodistas de Puerto Rico v. Mueller, 680 F.3d 70, 78 (1st Cir. 2012) (internal quotation marks omitted). When the district court

-8-

held that Plaintiffs' evidence regarding Defendants' knowledge and the bypass measures' effectiveness was "not germane to [its] inquiry," it decided in effect that the proffered evidence was irrelevant and therefore outside of the scope of admissible evidence available for review on summary judgment. That is the point at which the district court erred.

While the district court was correct that it should not substitute "knowledge" for "desire" in the Settlement Agreement, it does not follow that evidence of Defendants' knowledge and the effectiveness of the diversion systems is necessarily irrelevant. As a general matter, if we want to figure out what parties desire to achieve in a given situation, it makes sense to look at what they know about the situation, what steps they are taking, what results they are actually achieving, and how they respond to those results. As Plaintiffs point out, we considered this type of evidence to help determine a party's subjective intent in United States v. General Electric Co., albeit in a different doctrinal context. 670 F.3d 377, 387–88 (1st Cir. 2012) (evaluating the defendant's knowledge and conduct to decide whether the defendant had the requisite intent to find "arranger liability" under a different environmental statute).

Defendants maintain, however, that facts related to their knowledge and the effectiveness of the bypass systems are irrelevant in the context of this particular Settlement Agreement.

-9-

According to Defendants, the Settlement Agreement contemplates two methods of downstream passage, bypass or through the turbines, and the fact that Defendants installed diversionary structures is sufficient on its own to preclude a finding that they desired passage through the turbines: "Because the plain terms of the Agreement establish two basic methodologies (bypass or turbine passage) – and because subjective intent is the critical element – a signatory that has chosen to install diversionary structures does not 'desire to achieve' interim turbine passage."

Thus, according to Defendants, we should assess their "desire" from the vantage point of a fork in the road — at a certain point in time, they could choose to go either down the path of turbine passage or down the path of the bypass method. Once they chose the bypass method by installing interim diversionary facilities, no matter how ineffective they may turn out to be, there is no longer any possibility that they might desire turbine passage — that was the road not taken. A hypothetical dam owner operating under the Settlement Agreement could install interim diversionary facilities that it suspected would be ninety-nine percent ineffective, and ninety-nine percent of the endangered fish may continue to pass through the turbines with the full knowledge of the dam owner. In Defendants' view these circumstance could not lead a jury to infer that the owner desired passage through the turbines because of the owner's decision to install diversionary

facilities in the first place. We do not think that such a result is consistent with the language of the Settlement Agreement as a whole.

The Settlement Agreement does more than offer Defendants a binary choice between two methods of downstream passage; it also imposes obligations to study the effectiveness over time of whatever interim downstream passage facilities it may choose to implement and to make good faith efforts to reach certain efficiency goals. Thus, it seeks to fulfill its stated purpose of restoring endangered fish populations through an ongoing series of assessments and, if necessary, modifications to the Dams' facilities and operations. It also specifically contemplates the possibility that Defendants might desire downstream passage through the turbines in the event that interim bypass facilities prove ineffective.

Reading the Settlement Agreement as a whole, it makes more sense to assess Defendants' desire in the context of the continuous efforts required by the Settlement Agreement, rather than in reference to a single decision Defendants make at one particular point in time. This broader context belies the notion that the installation of diversionary facilities is alone sufficient to determine Defendants' desire regarding downstream passage and opens the door to evidence regarding the extent to

which the facilities actually work and what Defendants know about it.

Defendants point out, however, that nothing in the Settlement Agreement requires that interim diversion facilities be completely effective. In other words, there is no basis for holding Defendants to a strict liability standard by which any failure to prevent passage through the turbines, however trivial, triggers the obligation to conduct the Studies. Defendants argue that the consideration of evidence regarding the effectiveness of bypass methods would effectively impose a strict liability standard.

Defendants are correct that the Settlement Agreement does not require complete effectiveness. To be clear, the Agreement does not require Defendants to achieve any particular objectively measurable level of effectiveness, and neither should the court. But that does not mean effectiveness is irrelevant. Rather, it is one of the pieces of information forming the background against which the court or the fact finder can determine what Defendants desire. We do not expect the district court to look at evidence of effectiveness in isolation and draw conclusions therefrom. Its significance lies in relation to all of the other relevant background information. For example, to return to our hypothetical dam owner, assuming the record showed that the diversionary facilities were less than fully effective, the district court could

still grant summary judgment in concluding that the dam owner did not desire passage through the turbines based on other information, such as good faith efforts to ameliorate problems with the bypass method.  The important point is that it would reach that conclusion based on all of the relevant evidence.  Following this approach, the consideration of evidence related to the effectiveness of the bypass methods does not impose strict liability.

Defendants also make much of the fact that the Agencies that are signatories to the Settlement Agreement have never sought to enforce those provisions requiring Defendants to conduct the Studies.  According to Defendants, the absence of enforcement by the Agencies demonstrates conclusively that Defendants do not desire passage of the fish through the turbines, because "[t]he parties to an agreement know best what they meant." Reed & Reed, Inc. v. Weeks Marine, Inc., 431 F.3d 384, 388 (1st Cir. 2005) (internal quotation marks omitted).

It is true, as Defendants argue, that the conduct of the parties to an agreement often informs the court's interpretation of the agreement.  Id.  But this argument conflates two separate issues.  We are not concerned with contract interpretation in this case.  The district court and the parties all agree on the unambiguous meaning of the term "desire"; in the context of the Settlement Agreement it refers to Defendants' subjective intent.

-13-

Instead, we are faced with a factual question about what Defendants actually desired. Of course, the Agencies' conduct will be part of the overall context in which the court can evaluate that question. But the focus of that inquiry must be on the Defendants themselves. The conduct of the Agencies does not conclusively settle a factual question regarding Defendants' subjective intentions.

Moreover, the idea that a lack of agency enforcement necessarily implies compliance with the CWA places an undue restriction on the statutory provision for citizen suits. The language of that provision is broad; it allows citizens to bring suits "against any person . . . who is alleged to be in violation" of the CWA. 33 U.S.C. § 1365(a)(1). Citizens may sue an agency itself "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." § 1365(a)(2). On the other hand, the statute prohibits citizen suits "if the Administrator or State has commenced and is diligently prosecuting [an] action . . . to require compliance" with the CWA. § 1365(b)(1)(B).

On the record before us, there is no basis for a suit against the Agencies themselves for failure to perform non-discretionary duties under section 1365(a)(2). Neither is there any active agency enforcement that would prohibit a citizen suit under

section 1365(b)(1)(B).  Rather, what we have here is a claim that there is a lack of discretionary enforcement.

The statute does not explicitly address this situation. But if courts dismiss citizen suits on the grounds that a lack of discretionary enforcement necessarily implies a defendant's compliance with the CWA, then citizen suits will only be able to go forward when there is a failure of mandatory agency action; i.e., when the plaintiff can sue the agency itself.  We do not read the provisions of section 1365(a)(1), however, as limited to only those situations where section 1365(a)(2) applies.  Section 1365(a)(2) expands upon section 1365(a)(1) by adding an additional basis for a citizen suit; it is not a restriction.

We think there is a better approach. A lack of discretionary enforcement may indicate either a defendant's compliance with the statute or a failure by the agency to rein in a non-compliant defendant.  A court must look at the facts of the particular case; it cannot draw a conclusion solely from the fact of a lack of discretionary enforcement.  Here, the Agencies' conduct should be considered as part of the whole record, but not dispositive in itself.

That point is where our fundamental disagreement with the dissent arises.  According to the dissent, we are ignoring the fact that the Agreement provides a process by which the signatories address any problems with effectiveness, so we should not be

-15-

involved.   But in focusing narrowly on the role of the agencies within the Agreement, the dissent ignores the basic fact that the Agreement has been incorporated into the statutory framework of the CWA. And in the CWA, Congress specifically provided for citizen suits. Therefore, the courts necessarily have a role to play in assessing compliance with the statute alongside that of the agencies.

Accordingly, a court can make an independent determination, from the facts on the record as a whole, about whether Defendants desire passage through the turbines. When a court makes that determination, for the reasons we have explained, evidence regarding the Defendants' knowledge and the effectiveness of their measures will be relevant for the purposes of summary judgment. If we decide that the parties to the Agreement put enforcement solely in the hands of the agencies and refuse to look further, we abdicate our responsibility over the workings of the statute. The parties to the Agreement cannot negotiate away the role that Congress intended for the court to play under the statute when it provided for citizen suits.

We wish to be abundantly clear about the scope of this opinion.  We are reversing the district court's order on the narrow procedural grounds that it failed to consider all relevant evidence in the light most favorable to Plaintiffs.  We express no opinion on the substantive question of Defendants' compliance with the

Settlement Agreement, nor have we determined whether Plaintiffs have offered enough evidence to create an issue of material fact. That will be for the district court to answer on remand, when it considers the entire record in accordance with this opinion.

### III.  Conclusion

For the foregoing reasons, we **VACATE** the district court's rulings and **REMAND** for further proceedings consistent with this opinion.  Each side shall bear their own costs.

**- Dissenting Opinion Follows -**

**KAYATTA, Circuit Judge, Dissenting.** The plaintiffs argue that the district court should have considered evidence that the defendants' chosen methods of passing fish downstream are less than fully effective at keeping the fish out of the dam turbines. Normally, consideration of such an argument would lead us to ask: What significance does the Agreement assign to evidence that a fish passage methodology chosen by an owner is of questionable effectiveness?  The majority, drawn in by the myopic focus of the plaintiffs, instead asks and answers a different, much more abstract, question: Whether a determination of what a person desires can be informed by evidence of the results of his behavior?  The majority then assigns contractual significance to its answer to this question by assuming that the Agreement anticipates evidence of effectiveness serving as a device for continuously reevaluating what the owners desire.  Because the Agreement clearly anticipates that evidence of effectiveness will be dealt with very differently, I respectfully dissent.

The Agreement obliged each dam owner to take interim steps to protect fish migrating downstream while permanent solutions were devised.  Specifically, the owners agreed to "continue and where needed improve existing interim operational measures" to reduce entrainment (i.e., the drawing of fish into the turbines) and to "eliminate significant injury or mortality . . . to out-migrating species."  Accordingly, each owner agreed to

-18-

"develop" a "plan for interim downstream passage facilities and/or operational measures to minimize impacts on downstream migrating fish."[5]  The Agreement gave great power to the signatory agencies when it came to the design of the owners' plans: the owners had to consult with the agencies in preparing their plans, which were subject to agency approval "with evaluation based on qualitative observations."  Moreover, if the interim plan involved changes to the project facilities,[6] rather than just operational changes, the design of any "fish passage . . . facility" had to be approved by the signatory agencies before being filed with the Federal Energy Regulatory Commission ("FERC") or the Maine Department of Environmental Protection.

Importantly, if the plans involved diverting the fish around the turbines, the Agreement set no required level of effectiveness.  It did, though, suggest that one hundred percent

---

[5]    The available "existing interim operational measures" varied somewhat between projects; for all four of the projects at issue on appeal (the Weston, Lockwood, Shawmut, and Hydro-Kennebec Projects), they included "controlled spills" and "temporary turbine shutdowns"; for Shawmut, Weston, and Lockwood, they also included use of sluiceways.  For the latter three projects, the Agreement specified "that fish passage by means of sluiceways and/or controlled spills [is] the first and preferred approach to interim downstream fish passage."  Hydro-Kennebec had no such term.

[6]    The Agreement distinguishes between new "facilities" (evidently, whatever diverts the fish away from the turbines, including floating booms) and "new diversionary structures."  The Agreement assured Lockwood, Shawmut, and Weston that its terms did not require "[c]onstruction of new diversionary structures to achieve success," but Hydro-Kennebec received no such assurance.

diversion efficiency was not required: the Agreement's stated aim was to "diminish" entrainment, eliminate "significant" injury or mortality, and "minimize" impacts, "with evaluation based on qualitative observations."[7] This is not to say that the Agreement was indifferent to the effectiveness of whatever diversion methodologies the owners might develop. Any "newly constructed interim and permanent downstream fish passage facilit[y]" was subject to effectiveness tests based on "targeted passage efficiency goals." Agrmt. § III(F). If the new facilities fell short of those goals, the owners had to undertake good faith mitigation efforts at the behest of the agencies; if even these failed, the agencies could seek continued funding from the owners for alternative programs, including possibly trucking the fish around the dam.

The Agreement did not actually preclude an owner from proposing a plan that relied on achieving downstream passage by running the fish downriver through the turbines. But if an owner chose that option (after adult fish were inhabiting the impoundment

_____

[7]    Indeed, the 1998 amendment to Weston's water quality certification reads: "Interim Downstream Fish Passage[:] The applicant shall continue and where needed improve existing interim operational measures to diminish entrainment, allow downstream passage, and eliminate significant injury or mortality to out-migrating anadromous fish, in accordance with the terms of the [Agreement]."

above the dam), the owner first had to do quantitative fish-safety studies.[8]

The fork in the road thus established was clear:  a facility owner had to have a plan for downstream passage that could get approved; if the plan involved only operational modifications (the preferred approach for three of the dams), evaluation was based on qualitative observations; if it involved new facilities, effectiveness studies were necessary (though not until the facility was in place).  But if the owner wanted to avoid the cost and effort entailed in a diversion methodology, and instead achieve fish passage to the agencies' satisfaction by running the adult fish through the turbines, it first had to do a quantitative study of whether turbine passage was safe.

There is no doubt about what the owners decided to do: they acceded to the agencies' preference and sought to achieve fish passage by use of existing and upgraded diversionary measures.

---

[8]  The defendants likely conceded in their answer to the complaint that adult salmon inhabit the impoundment above Hydro-Kennebec.  The district court assumed that the habitation requirement was met for all dams, and I do likewise for present purposes.

The rules are different for juvenile fish.  At Lockwood, Shawmut, and Weston, if passing juvenile salmon and shad downstream by the preferred methods (sluiceways or spills) is not "successful", then to the extent that the owners want to satisfy their obligations under the Agreement by choosing to send the fish through the turbines, site-specific qualitative survival studies are needed.  (The requirement for site-specific qualitative studies at Hydro-Kennebec has no defined relationship to the "success[]" of other methods, as no preferred method is named.)

Specifically, as called for by the Agreement, the owners worked with the agencies to develop and implement--sometimes at significant cost--operational modifications and diversionary measures. The central changes have hardly been wink-and-nods. As an example, here is a description of the plan submitted by Hydro Kennebec in 2006:

> [T]he interim downstream fish passage facility consists of a 10-foot-deep, 160-foot-long angled fish guidance boom in the project forebay leading to a 4-foot-wide by 8-foot deep gated slot cut into an existing concrete wall located between the turbine intakes and the bascule gates adjacent to the spillway. The boom is suspended from the surface by [sic] series of floating barrels and is cabled to lead ballast on the bottom, with each end attached to an existing concrete wall. The slot contains a downward-opening steel slide gate that is capable of passing about four percent of the project turbine flows, or a maximum of about 300 [cubic feet per second]. The gate discharges into an existing plunge pool that drains into the project tailrace.

The Maine Department of Environmental Protection expressly determined that this plan "satisfactorily address[ed]" the requirement in Hydro-Kennebec's water quality certification (incorporated from the Agreement) that operational measures to ensure downstream fish passage be improved. The Department conditioned its approval, though, on Hydro-Kennebec's proposing and conducting an effectiveness study in 2007 and, consistent with the Agreement, "in the event that it is revealed that certain interim downstream measures are needed to avoid significant downstream turbine injury and/or mortality . . . consult[ing] with the

resource agencies and agree[ing] to undertake cost-effective measures designed to minimize mortality at the site."

With their proposed operational and diversion plans approved, no owner ever chose to assume the obligation to justify the essentially "do-nothing" plan of relying on turbine pass-through as its fish passage methodology.[9] And since no owner sought approval of any plan relying on successful turbine pass-through to allow adult salmon or shad to travel downstream, none were required to do a pre-approval quantitative mortality study.

The agencies, it seems, have subsequently monitored performance, in some instances securing substantial modifications. For example, after the Hydro-Kennebec's interim fish bypass was built in 2006, the plunge pool was deepened on agency request. And of the three dams for which the Agreement specified that operational modifications were the preferred method of achieving downstream passage, two have now installed fish-diversion booms.

It is fair to say that one cannot reasonably read the Agreement and the record and find that the owners, upon first presenting their plans to achieve downstream passage by

---

[9] Evidently, "[a]s part of the . . . Accord and prior to the listing of Atlantic Salmon [as endangered], turbine passage had previously been approved as a downstream passage route for juvenile fish, based on observation studies indicating no significant injury or mortality." We are concerned here, however, only with adult fish.

diversionary measures, "desired" to achieve anything other than what they were obviously proposing.  In other words, it is clear that no owner, in proposing its fish passage methodology for agency approval, sought to convince the agencies that simply running the fish through the turbine would do the trick.  And as I read the majority's opinion, my colleagues do not actually dispute this conclusion.  Rather, they bring their focus forward in time beyond the "vantage point of [the] fork in the road" when the owners first sought approval for their plans.  The majority reasons that if it turned out, down the road so to speak, that an approved fish passage methodology was not effective (to what extent, we are not told), and the owner continued using that methodology, then a fact finder could infer that the owner at that point began to desire to achieve fish passage by turbine pass-through.

The flaw in this reasoning is that it ignores how the Agreement addresses assessments of the effectiveness of the fish passage plans that were initially proposed at the fork in the road. Cf., e.g., Twombly v. AIG Life Ins. Co., 199 F.3d 20, 23 (1st Cir. 1999) (under Maine law, noting that courts must examine the whole instrument--there, an insurance contract--to ascertain the intent of the parties and to eliminate possible ambiguity).  As noted above, all of the plans were evaluated at least qualitatively as part of the negotiations with the agencies--and their progress was reported through annual reports, with plans set to be reassessed at

-24-

least by this year.  Plus, any "newly constructed interim . . . downstream fish passage facilities" are, once operational, subject to effectiveness tests based on "targeted passage efficiency goals."  Agrmt. § III(F).  Section III(F) further provides:

> In the event that effectiveness studies show that passage at individual projects is less than the targeted passage efficiency goals, [the] dam owners will make a good faith effort to achieve these goals through modification of facilities and/or operations, following consultation with the resource agencies.  In the event that studies show that, subsequent to said modifications, passage at individual projects continues to be less than the targeted efficiency goals, resource agencies may seek continued funding for trap and truck or other programs, or other mitigation from [the] dam owners.  Any disputes will be handled through the FERC process.

This language makes clear that:  (1) no changes to new facilities need be made by the owner unless "targeted passage efficiency goals" are missed; (2) if goals are missed, then the next step is not to deem that the owners "desire" the goals to be missed, but rather to require the owners to make good faith modification efforts, in consultation with the agencies; (3) if the modifications fall short in the judgment of the agencies, then the resource agencies "may seek continued funding for trap and truck or other programs . . . ."; and (4) any disputes will be resolved through the FERC process.  In short, the Agreement creates a process of what seems to be near-constant interaction and negotiation between the dam owners and the signatory agencies.

But, says the majority, suppose some fish get through the booms?  Could not the court then rule that, notwithstanding the owner's conceded desire at the time it opted to rely on diversionary methods to secure agency approval for its plan to pass fish downstream, the owner later developed a desire to use turbine passage?  By this logic, if the diversionary method chosen is discovered to be anything less than one hundred percent effective, the owner might be found to have developed a "desire" that some fish go through the turbine.  This blindered reading, however, ignores and undercuts section III(F) as applied to interim facilities for downstream fish migration.  Read in context, the language upon which the majority hinges its analysis is plainly meant to set the terms of owner-agency negotiation by requiring the owners to conduct safety studies before proposing the turbines as their chosen method of moving the fish downstream--not to serve as a pretext for revisiting and re-labeling the owner's choice based on its effectiveness.  Simply put, given the existence of section III(F), it makes no sense to claim that the parties buried in section IV an unstated, standardless procedure for using evidence of effectiveness in an entirely different manner that trumps the actual procedures upon which the parties expressly settled.  Cf. Fishman v. LaSalle Nat. Bank, 247 F.3d 300, 302-03 (1st Cir. 2001) (in construing an unclearly drafted commercial note, explaining that "[i]t is centrally important" that the prevailing

interpretation "make[] sense--that is, [carry] out what one might imagine to be a plausible objective of parties so situated. . . . Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.")

Sensing this problem, the majority posits the possibility that an owner's diversion facility might turn out to be ninety-nine percent ineffective (presumably on a sustained basis, even when maintained in accordance with the plan and approval). Plaintiffs of course point to no evidence in the record to show that such is actually the case. Even if it were so, though, the Agreement would leave it to the agencies to decide whether to have the owner revise its method, go to a trap-and-truck program, or do something else. Of course, if at any point the owner falls back on proposing that it can satisfy its obligation to "diminish entrainment . . . and eliminate significant injury or mortality . . . to out-migrating" fish by sending them through the turbines, then quantitative safety studies would have to accompany that proposal. But that would be because, within the context of plan negotiations with the agencies (i.e., the context in which the term "desire" is used), the defendants actually "desired"--that is, proposed, chose, or requested--to rely on turbine passage to satisfy their fish protection obligations.

I do concede that the majority is not deciding now whether there is enough evidence to create an issue of material

fact; it only says that the district court need "consider" the evidence of effectiveness. But even this modest requirement must mean that the majority believes that some amount of evidence of ineffectiveness could affect the outcome of the case. See Fed. R. Evid. 401(b); Fed. R. Civ. P. 56(a) (requiring disputes of "material" fact). The able district court judge will quite rightly ask: effectiveness by what measure, given that there is no objective standard set out in the Agreement? And toward exactly what end, in light of section III(F) and the Agreement's overall commitment to resolving fish-safety concerns through ongoing agency-owner negotiations? Suppose, for example, the targeted passage efficiency goals are met, but a nontrivial number of fish still evade diversion: can the owners be deemed to desire to use turbine passage? Suppose the goals are not met, but the resource agencies have not opted for mitigation such as a long-term shutdown pending more quantitative studies;[10] should the district court overrule the agencies' efforts under section III(F), and by what standard of review? The majority offers no guidance on these questions, all of which are reasonably raised by the new version of the Agreement forged by what the majority reads into the word "desire." Instead, the majority casts the case adrift without a paddle, further extending the litigation over fish passage

---

[10]    Short-term turbine shutdowns are (contrary to the suggestion of defendants) specifically anticipated in the Agreement as available interim operational measures.

-28-

methodologies that the parties to the Agreement thought they had managed to avoid.

By holding that the District Court must "consider" effectiveness in order to gauge ongoing "desire" in some abstract sense, the majority also allows the plaintiffs to do indirectly what they cannot do directly. I do not dispute that the plaintiffs could sue under the Clean Water Act for a breach of a term of the Agreement as incorporated into a water quality certification. Thus, if the provisions of Section III.F were being breached, citizens could sue. Citizen suit or otherwise, however, no court can rewrite the otherwise lawful manner in which the parties agreed to address modifying fish passage methodologies based on post-implementation evidence of effectiveness.

Imagine a plaintiff brings suit claiming that the owners are in violation of the Agreement because X% of the adult salmon are passing through the turbines. I would think it clear that no such claim could survive, because the Agreement plainly sets no objective measure against which to compare a facility's effectiveness, and gives the agencies discretion to approve the interim downstream passage plans. And those approvals stand unchallenged. Now consider the gist of what these plaintiffs say: "I want a court to find that, because X% of the salmon pass through the turbine, the owner must desire turbine pass-through as its method to achieve downstream passage, and therefore the agency

should not have approved the diversionary plan without first seeing quantitative fish safety studies." This is nothing more than a re-packaged version of the presumably defective hypothetical claim discussed above. By deeming evidence of effectiveness "relevant," the majority allows the plaintiffs to act as though the term "desire" both established a de facto tipping point (albeit one to be guessed at under the totality of the circumstances) and set the remedy for failing to attain it (when in fact section III(F) serves that function, at least for new facilities). Absent some actual effort by the defendants to propose or rely on turbine passage as a way to satisfy their fish-protection obligations, however, failure to do a quantitative effectiveness study neither violates the Agreement nor generates a cause of action for the plaintiffs.

For the foregoing reasons, any determination of how the owners desire to achieve fish passage under the Agreement must be based on the nature of the plans that they proposed and developed with the agencies. Any judgment about the adequacy and effectiveness of those plans was one to be made by the agencies in approving and monitoring those plans, not by the district court peeking over the agencies' shoulders. And any disputes concerning what measures the agencies required to improve effectiveness were to be handled through the FERC dispute resolution process.

In rejecting this reasoning, the majority opinion regrettably upends this 16-year-old Agreement, ironically by

undercutting one of its central purposes:  "avoid[ing] extensive litigation over fish passage methodologies."  Crafted with the aid of five environmental groups[11], the Agreement marked a significant turning point in the long history of Maine's exploitation of one of its great rivers.  By facilitating the transfer of the Edwards Dam to the state, and securing some of the funds for dam removal, it led to the eventual removal of the Edwards Dam--an event etched in the memory of most Mainers desiring to see industry, environmental groups, and regulators work to find a balance that better protects the state's natural resources.  Toward that same end, the Agreement funded the next phase of a fisheries restoration program for the Kennebec, and led to the installation of new interim downstream fish passage facilities at some of the hydroelectric project sites. I hope that the majority's willingness to read such an Agreement in a manner that ignores its overall structure will not deter owners from making other beneficial agreements with state and federal resource agencies for fear that third parties will flyspeck them for supposed ambiguities that none of the parties to the agreement claims exists.

---

[11]     The environmental groups, collectively known as the Kennebec Coalition, were American Rivers, Inc., the Atlantic Salmon Federation, Kennebec Valley Chapter of Trout Unlimited, the Natural Resources Council of Maine, and Trout Unlimited.