STAHL, Circuit Judge.
Two conservation groups, Friends of Merrymeeting Bay and Environment Maine (collectively, “Plaintiffs”), brought two citizen enforcement suits containing claims under the Endangered Species Act (“ESA”), 16 U.S.C. §§ 1531-1544, and the Clean Water Act (“CWA”), 33 U.S.C. §§ 1251-1387, against Hydro Kennebec, LLC, Brookfield Power U.S. Asset Management, LLC, Merimil Limited Partnership, FPL Energy Maine Hydro, LLC, and Brookfield Renewable Services Maine, LLC. (collectively “Defendants”),[1] who operate four hydroelectric dams (“Dams”) on the Kennebec River. The district court entered summary judgment in favor of Defendants as to the CWA claims in both cases below, and Plaintiffs appeal those rulings.[2] For the following reasons, we vacate and remand.
I. Background
The facts of this case are set forth in detail in the district court’s opinions. Friends of Merrymeeting Bay v. Brookfield Power U.S. Asset Mgmt., No. 11-cv-35-GZS, 2013 WL 145506, at *2-4 (D.Me. Jan. 14, 2013);[3] Friends of Merrymeeting Bay v. NextEra Energy Res., LLC, No. 11-cv-38-GZS, 2013 WL 145733, at *2-4 (D.Me. Jan. 14, 2013). We briefly reiterate them here only as necessary to provide context for the issues on appeal.
The crux of the matter is that certain endangered species of fish, including Atlantic salmon, pass through Defendants’ Dams when they migrate down the Kenne-bec River to the sea. Each Dam operates under the terms of water-quality certifications issued by the state of Maine pursuant to Section 401 of the CWA, 33 U.S.C. § 1341. All of the Dam’s certifications incorporate the provisions of the Kennebec Hydro Developers Group Settlement Agreement (“Settlement Agreement”), which Defendants (among other operators of hydroelectric projects) entered into in *33 1998 with various federal and state agencies (“Agencies”).
The Settlement Agreement allows for two basic methods of downstream fish passage, either through the turbines of the Dams or around the turbines by various bypass methods. It further provides that:
to the extent that licensee desires to achieve interim downstream passage of out-migrating adult Atlantic salmon and/or adult shad by means of passage through turbine(s), licensee must first demonstrate, through site-specific qualitative studies designed and conducted in consultation with the resource agencies, that passage through turbine(s) will not result in significant injury and/or mortality (immediate or delayed).
After entering into the Settlement Agreement, Defendants, in consultation with the Agencies, constructed diversionary facilities to take the fish around the turbines at all four of the Dams.
Plaintiffs filed a two-count complaint in each case on January 31, 2011, alleging that endangered fish continue to pass through the Dams’ turbines despite the construction of the diversionary facilities, resulting in injury and death to some of the fish. Plaintiffs claimed in Count I that the fish casualties amounted to an illegal “taking” of an endangered species in violation of the ESA. In Count II, Plaintiffs argued that Defendants are in violation of their water-quality certifications, and thus the CWA, because they have not conducted the “site-specific quantitative studies” (“Studies”) that are required if Defendants desire passage of the fish through the turbines. According to Plaintiffs, evidence in the record shows that Defendants’ diversionary facilities are ineffective, and that Defendants know they are ineffective, which raises a question of fact about whether Defendants desire at least some of the fish to pass through the turbines.
The district court entered summary judgment in favor of Defendants on Count II in both cases. We find that the district court erred by entering judgment in favor of Defendants without properly considering the record as a whole in the light most favorable to Plaintiffs. We therefore vacate and remand for further proceedings consistent with this opinion.
II. Analysis
We review the district court’s summary judgment decision de novo. Cracchiolo v. E. Fisheries, Inc., 740 F.3d 64, 69 (1st Cir.2014). The dispositive issue with respect to the CWA claim is a question that is straightforward to pose but not particularly easy to answer: do the Defendants “desire to achieve” passage of the endangered fish through the turbines? If so, Defendants must conduct the Studies in order to remain compliant with the terms of the Settlement Agreement.
The district court decided as a preliminary matter that the relevant language in the Settlement Agreement is unambiguous. Friends of Merrymeeting Bay, 2013 WL 145733, at *14.[4] It interpreted the word “desire” according to its commonly understood meaning — “to want” — equivalent to a party’s subjective intent. Id. The district court then categorically rejected Plaintiffs’ evidence related to: (1) whether fish were in fact passing through the turbines; (2) and whether Defendants knew fish were passing through the turbines. On the grounds that “[kjnowledge does not equate to desire,” the district court held that Plaintiffs’ evidence related to those *34 two topics was “not germane to the [c]ourt’s inquiry.” Id. Reviewing the portion of the record that remained, the district court concluded that the “evidence ... on summary judgment reveals that Defendants do not desire to pass [endangered fish] through the turbines.” Id.
We agree that the language of the Settlement Agreement is not ambiguous, and that the common meaning of the word “desire,” corresponding to a party’s subjective intent, should apply. Questions of intent in the context of contract interpretation often arise when the language of a contract is ambiguous and we must determine the parties’ intended meaning. That is not the question here. Instead, the unambiguous contractual language in this case presents a factual question regarding the subjective intent underlying Defendants’ conduct pursuant to the contract.
This type of question does not appear to arise frequently in contract disputes. Questions of the intent underlying a party’s conduct are more common in other contexts, such as employment discrimination suits. We have not found another case specifically analogous to this one, where a party’s subjective desire for a particular outcome triggers the application of a contractual provision.
Nevertheless, certain principles apply when a district court resolves questions about a party’s underlying intent at the summary judgment stage, regardless of the specific doctrinal context. We have held that courts should “use special caution in granting summary judgment as to intent. Intent is often proved by inference, after all, and on a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party.” Daniels v. Agin, 736 F.3d 70, 83 (1st Cir.2013). But even when “elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the nonmoving party rests merely upon con-clusory allegations, improbable inferences, and unsupported speculation.” Vives v. Fajardo, 472 F.3d 19, 21 (1st Cir.2007) (internal quotation mark omitted).
In determining whether Plaintiffs introduced sufficient evidence to survive summary judgment, the district court “examines the entire record in the light most flattering to the nonmovant and in-dulg[es] all reasonable inferences in that party’s favor.” Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir.1997) (internal quotation marks omitted). This review of the record is limited, however, to evidence that “would be admissible or usable at trial.” Asociacion De Periodistas De Puerto Rico v. Mueller, 680 F.3d 70, 78 (1st Cir.2012) (internal quotation marks omitted). When the district court held that Plaintiffs’ evidence regarding Defendants’ knowledge and the bypass measures’ effectiveness was “not germane to [its] inquiry,” it decided in effect that the proffered evidence was irrelevant and therefore outside of the scope of admissible evidence available for review on summary judgment. That is the point at which the district court erred.
While the district court was correct that it should not substitute “knowledge” for “desire” in the Settlement Agreement, it does not follow that evidence of Defendants’ knowledge and the effectiveness of the diversion systems is necessarily irrelevant. As a general matter, if we want to figure out what parties desire to achieve in a given situation, it makes sense to look at what they know about the situation, what steps they are taking, what results they are actually achieving, and how they respond to those results. As Plaintiffs point out, we considered this type of evidence to help determine a party’s subjective intent in United States v. General Electric Co., albeit in a different doctrinal context. 670 *35 F.3d 377, 387-88 (1st Cir.2012) (evaluating the defendant’s knowledge and conduct to decide whether the defendant had the requisite intent to find “arranger liability” under a different environmental statute).
Defendants maintain, however, that facts related to their knowledge and the effectiveness of the bypass systems are irrelevant in the context of this particular Settlement Agreement. According to Defendants, the Settlement Agreement contemplates two methods of downstream passage, bypass or through the turbines, and the fact that Defendants installed diversionary structures is sufficient on its own to preclude a finding that they desired passage through the turbines: “Because the plain terms of the Agreement establish two basic methodologies (bypass or turbine passage)&emdash;and because subjective intent is the critical element&emdash;a signatory that has chosen to install diversionary structures does not ‘desire to achieve’ interim turbine passage.”
Thus, according to Defendants, we should assess their “desire” from the vantage point of a fork in the road&emdash;at a certain point in time, they could choose to go either down the path of turbine passage or down the path of the bypass method. Once they chose the bypass method by installing interim diversionary facilities, no matter how ineffective they may turn out to be, there is no longer any possibility that they might desire turbine passage&emdash; that was the road not taken. A hypothetical dam owner operating under the Settlement Agreement could install interim diversionary facilities that it suspected would be ninety-nine percent ineffective, and ninety-nine percent of the endangered fish may continue to pass through the turbines with the full knowledge of the dam owner. In Defendants’ view these circumstance could not lead a jury to infer that the owner desired passage through the turbines because of the owner’s decision to install diversionary facilities in the first place. We do not think that such a result is consistent with the language of the Settlement Agreement as a whole.
The Settlement Agreement does more than offer Defendants a binary choice between two methods of downstream passage; it also imposes obligations to study the effectiveness over time of whatever interim downstream passage facilities it may choose to implement and to make good faith efforts to reach certain efficiency goals. Thus, it seeks to fulfill its stated purpose of restoring endangered fish populations through an ongoing series of assessments and, if necessary, modifications to the Dams’ facilities and operations. It also specifically contemplates the possibility that Defendants might desire downstream passage through the turbines in the event that interim bypass facilities prove ineffective.
Reading the Settlement Agreement as a whole, it makes more sense to assess Defendants’ desire in the context of the continuous efforts required by the Settlement Agreement, rather than in reference to a single decision Defendants make at one particular point in time. This broader context belies the notion that the installation of diversionary facilities is alone sufficient to determine Defendants’ desire regarding downstream passage and opens the door to evidence regarding the extent to which the facilities actually work and what Defendants know about it.
Defendants point out, however, that nothing in the Settlement Agreement requires that interim diversion facilities be completely effective. In other words, there is no basis for holding Defendants to a strict liability standard by which any failure to prevent passage through the turbines, however trivial, triggers the obligation to conduct the Studies. Defendants *36 argue that the consideration of evidence regarding the effectiveness of bypass methods would effectively impose a strict liability standard.
Defendants are correct that the Settlement Agreement does not require complete effectiveness. To be clear, the Agreement does not require Defendants to achieve any particular objectively measurable level of effectiveness, and neither should the court. But that does not mean effectiveness is irrelevant. Rather, it is one of the pieces of information forming the background against which the court or the fact finder can determine what Defendants desire. We do not expect the district court to look at evidence of effectiveness in isolation and draw conclusions therefrom. Its significance lies in relation to all of the other relevant background information. For example, to return to our hypothetical dam owner, assuming the record showed that the diversionary facilities were less than fully effective, the district court could still grant summary judgment in concluding that the dam owner did not desire passage through the turbines based on other information, such as good faith efforts to ameliorate problems with the bypass method. The important point is that it would reach that conclusion based on all of the relevant evidence. Following this approach, the consideration of evidence related to the effectiveness of the bypass methods does not impose strict liability.
Defendants also make much of the fact that the Agencies that are signatories to the Settlement Agreement have never sought to enforce those provisions requiring Defendants to conduct the Studies. According to Defendants, the absence of enforcement by the Agencies demonstrates conclusively that Defendants do not desire passage of the fish through the turbines, because “[t]he parties to an agreement know best what they meant.” Reed & Reed, Inc. v. Weeks Marine, Inc., 431 F.3d 384, 388 (1st Cir.2005) (internal quotation marks omitted).
It is true, as Defendants argue, that the conduct of the parties to an agreement often informs the court’s interpretation of the agreement. Id. But this argument conflates two separate issues. We are not concerned with contract interpretation in this case. The district court and the parties all agree on the unambiguous meaning of the term “desire”; in the context of the Settlement Agreement it refers to Defendants’ subjective intent.
Instead, we are faced with a factual question about what Defendants actually desired. Of course, the Agencies’ conduct will be part of the overall context in which the court can evaluate that question. But the focus of that inquiry must be on the Defendants themselves. The conduct of the Agencies does not conclusively settle a factual question regarding Defendants’ subjective intentions.
Moreover, the idea that a lack of agency enforcement necessarily implies compliance with the CWA places an undue restriction on the statutory provision for citizen suits. The language of that provision is broad; it allows citizens to bring suits “against any person ... who is alleged to be in violation” of the CWA. 33 U.S.C. § 1365(a)(1). Citizens may sue an agency itself “where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.” § 1365(a)(2). On the other hand, the statute prohibits citizen suits “if the Administrator or State has commenced and is diligently prosecuting [an] action ... to require compliance” with the CWA. § 1365(b)(1)(B).
On the record before us, there is no basis for a suit against the Agencies them *37 selves for failure to perform non-discretionary duties under section 1365(a)(2). Neither is there any active agency enforcement that would prohibit a citizen suit under section 1365(b)(1)(B). Rather, what we have here is a claim that there is a lack of discretionary enforcement.
The statute does not explicitly address this situation. But if courts dismiss citizen suits on the grounds that a lack of discretionary enforcement necessarily implies a defendant’s compliance with the CWA, then citizen suits will only be able to go forward when there is a failure of mandatory agency action; ie., when the plaintiff can sue the agency itself. We do not read the provisions of section 1365(a)(1), however, as limited to only those situations where section 1365(a)(2) applies. Section 1365(a)(2) expands upon section 1365(a)(1) by adding an additional basis for a citizen suit; it is not a restriction.
We think there is a better approach. A lack of discretionary enforcement may indicate either a defendant’s compliance with the statute or a failure by the agency to rein in a non-compliant defendant. A court must look at the facts of the particular case; it cannot draw a conclusion solely from the fact of a lack of discretionary enforcement. Here, the Agencies’ conduct should be considered as part of the whole record, but not disposi-tive in itself.
That point is where our fundamental disagreement with the dissent arises. According to the dissent, we are ignoring the fact that the Agreement provides a process by which the signatories address any problems with effectiveness, so we should not be involved. But in focusing narrowly on the role of the agencies within the Agreement, the dissent ignores the basic fact that the Agreement has been incorporated into the statutory framework of the CWA. And in the CWA, Congress specifically provided for citizen suits. Therefore, the courts necessarily have a role to play in assessing compliance with the statute alongside that of the agencies.
Accordingly, a court can make an independent determination, from the facts on the record as a whole, about whether Defendants desire passage through the turbines. When a court makes that determination, for the reasons we have explained, evidence regarding the Defendants’ knowledge and the effectiveness of their measures will be relevant for the purposes of summary judgment. If we decide that the parties to the Agreement put enforcement solely in the hands of the agencies and refuse to look further, we abdicate our responsibility over the workings of the statute. The parties to the Agreement cannot negotiate away the role that Congress intended for the court to play under the statute when it provided for citizen suits.
We wish to be abundantly clear about the scope of this opinion. We are reversing the district court’s order on the narrow procedural grounds that it failed to consider all relevant evidence in the light most favorable to Plaintiffs. We express no opinion on the substantive question of Defendants’ compliance with the Settlement Agreement, nor have we determined whether Plaintiffs have offered enough evidence to create an issue of material fact. That will be for the district court to answer on remand, when it considers the entire record in accordance with this opinion.
III. Conclusion
For the foregoing reasons, we VACATE the district court’s rulings and REMAND for further proceedings consistent with this opinion. Each side shall bear their own costs.

. The two lawsuits below (case numbers 11-cv-35 and ll-cv-38) have been consolidated on appeal. Case number ll-cv-38 included additional defendants NextEra Energy Resources, LLC and NextEra Energy Maine Operating Services, LLC, but they are not parties to the appeal.

. In both district court cases, the ESA claim was Count I and the CWA claim was Count II. In case number ll-cv-35, the district court granted Defendants' motion to dismiss Count I. Friends of Merrymeeting Bay v. Brookfield Power U.S. Asset Mgmt., No. 11-cv-35-GZS, 2013 WL 145506, at *2-4 (D.Me. Jan. 14, 2013). In case number 11-cv-38, the district court denied Defendants’ motion for summary judgment as to Count I. Friends of Merrymeeting Bay v. NextEra Energy Res., LLC, No. 11-cv-38-GZS, 2013 WL 145733, at *2-4 (D.Me. Jan. 14, 2013). In the present appeal, Plaintiffs only challenge the district court’s rulings as to Count II, the CWA claim.

.In case number 1 l-cv-35, the district court issued two orders on the same day. The first order, cited above, recounts the facts of the case and rules on Defendants’ motion to dismiss. The second order granted summary judgment for Defendants as to Count II. Friends of Merrymeeting Bay v. Brookfield Power U.S. Asset Mgmt., No. 11-cv-35-GZS, 2013 WL 145580, at *4 (D.Me. Jan. 14, 2013). It is the second order from which Plaintiffs appeal.

. Although there are two district court opinions below, the analysis of the CWA claim in each is identical.